Samuel H. **SHEPPARD**, Petitioner,

v.

E. L. **MAXWELL**, Warden, Ohio Penitentiary, Respondent.

Civ. No. 6640.

United States District Court
S. D. Ohio, E. D.

July 15, 1964.

F. Lee Bailey, Boston, Mass., Benjamin L. Clark, Columbus, Ohio, Russell A. Sherman, Elyria, Ohio, for petitioner.

William B. Saxbe, Atty. Gen. of Ohio, Columbus, Ohio, David L. Kessler and John Cianflona, Asst. Attys. Gen., Columbus, Ohio, for respondent.

WEINMAN, Chief Judge.

This matter is before the Court upon a petition for a writ of habeas corpus filed against the Warden of The Ohio State Penitentiary in Columbus, Ohio, where petitioner is incarcerated pursuant to a judgment of the Court of Common Pleas of Cuyahoga County, Ohio upon a conviction of murder in the second degree.

When the Court took this matter under advisement, a pre-trial conference was held to discuss the procedures to be followed in presenting the issues in the case. The purpose of that conference, and similar ones which followed, was to expedite the case in its preparation and presentation for final determination. As a result of the first conference, it was agreed that all preliminary proceedings would be by pre-trial orders; those orders to be by agreement of counsel and/or by order of the Court.

One of the pre-trial orders agreed upon and filed by counsel for the parties sets forth the history of the case. That history, with the references to exhibits attached to the pre-trial order omitted, is as follows:

"Petitioner, Samuel H. Sheppard, was in July, 1954, a resident of Bay Village, Ohio, a suburb on the west side of Cleveland. He was a doctor of osteopathic medicine, specializing in Surgery, and a member of the staff of the Bay View Hospital. He was thirty years of age and was married to Marilyn Reese Sheppard, also thirty. They had been married for nine years and had one son, aged seven. Petitioner and his family lived in a house on the shore of Lake Erie, which house was owned by Marilyn. Petitioner was associated in the practice of medicine with his father and two older brothers, all doctors. He was in comfortable financial circumstances.

"On the night of July 3, 1954, petitioner and his wife entertained friends, Don and Nancy Ahearn, in their home. The Ahearns left at approximately 12:30 a. m., July 4, 1954; Marilyn saw them to the door, for petitioner was or appeared to be asleep on a couch in the living room. The evening had been a congenial one, and the Ahearns observed no indications of hostility between petitioner and his wife (who was pregnant) at any time during the evening. In fact, there were overt manifestations of affection between them.

"Shortly before 6:00 A.M. a telephone call was received from petitioner by J. Spencer Houk, mayor of Bay Village and a friend of petitioner. Houk lived two houses distant from the home of petitioner. Houk heard petitioner say:

'My God, Spence, get over here quick, I think they have killed Marilyn.'

Houk dressed and with his wife, Esther, drove within a short time the few hundred feet to petitioner's home. Upon arrival the Houks found petitioner on the first floor of the house. His face showed some injury, and he complained of pain in his neck. Esther Houk went up to the bedroom, at the suggestion of petitioner, to check on the condition of Marilyn Sheppard. She found Marilyn lying in a pool of blood on the bed. She was dead. The room was covered with splattered blood. It was determined that she had suffered some thirty-five blows about the head by some blunt instrument, causing death. There was some conflict as to how long she had been dead when discovered by the Houks.

"The story given by petitioner to police and at the trial, was substan-

tially as follows: As he was sleeping on the couch, he was awakened by a noise coming from the second floor. He thought he heard his name called. He went up the stairs, which was dimly lit by a light in the hall. He recognized only a white 'form' standing next to the bed where his wife slept. He grappled with the form, and was struck on the back of the neck which rendered him unconscious. Before losing consciousness petitioner heard loud moans, as if from someone injured. When petitioner recovered consciousness, he examined his wife, found or thought that she was dead, determined that his son (in an adjacent room) had not been harmed, and then, hearing noise of some sort on the first floor, ran down. He saw a form running out the door of the house nearest to Lake Erie, and pursued it to the shore. There he struggled again, and again lost consciousness. When he came to, he went back to the house, re-examined his wife, and called Mayor Houk. Petitioner was unable to establish (1) the number of people in the bedroom at the time of the first encounter or the time of said encounter; (2) the duration of his unconsciousness on either occasion, or (3) the sex or identity of any of the single or several assailants he encountered. He stated that his perceptions had been vague because he was asleep at the outset of the chain of events, and unconscious twice as it progressed.

"In the course of interrogations by police and the County Coroner, petitioner was asked if he had had sexual relations with one Susan Hayes, an ex-employee of the hospital, in March, 1954, in Los Angeles. Petitioner denied this, but later admitted it when confronted with her statement of the affair. The state contended that Miss Hayes was the motive for a premeditated murder, but the jury returned a verdict of murder in the second degree.

"The murder of Marilyn Sheppard captivated the attention of news media in an unprecedented manner. Editorials on the first page of a leading Cleveland newspaper, and news media generally, set up a hue and cry for a solution to the crime. An inquest was demanded and held, and petitioner's arrest was suggested most strongly by at least one leading newspaper. On July 30, 1954, petitioner was arrested; he was admitted to bail, and indicted a few days later, on August 17, 1954. He has been in custody ever since.

"The trial began on October 18, 1954, and on December 17 of the same year the cause was submitted to a jury in the Court of Common Pleas of Cuyahoga County. On December 21st the verdict of guilty of murder in the second degree was returned, and petitioner was sentenced to life imprisonment in the state penitentiary at Columbus, Ohio, where he is now detained in the custody of respondent.

"The details of the trial, which fill over seven thousand pages in the bill of exceptions, are not recited here; it is the understanding of counsel for both sides that it was not the purpose of this history to describe the voluminous evidence.

"On January 3, 1955, the trial court overruled a motion for new trial which had been based on numerous assignments of error occurring during trial and deliberation * * *.

"On May 9, 1955, the trial court denied a supplemental motion for new trial on ground of newly discovered evidence and based upon the affidavit of Paul Leland Kirk, a criminologist, who claimed to have demonstrated that blood tests made in the murder room proved the existence of blood which did not come from the defendant or the deceased. This evidence was not obtained until after the verdict had been returned.

"On July 20, 1955,[1] the Court of Appeals of Cuyahoga County affirmed the conviction of petitioner; and on July 25, 1955 the same Court affirmed the denial of the second motion for new trial * * *.

"On May 31, 1956, the Ohio Supreme Court affirmed the action of the Court of Appeals as to the case in chief, but did not discuss or pass upon the alleged newly discovered evidence. Two Judges dissented, expressing the view that Sheppard should be accorded a new trial * *.

"On November 14, 1956, the Supreme Court of the United States denied a petition for certiorari; application for rehearing was denied on December 19, 1956 * * *.

"On September 5, 1960, Chief Justice Weygandt denied an application for a writ of habeas corpus in the Ohio Supreme Court; the petition therefor was dismissed on May 5, 1961.

"On April 11th, 1963, petitioner filed a petition for a writ of habeas corpus in this Court, which is the action giving rise to this order.

"Petitioner, Samuel H. Sheppard, has at all times maintained that he was not guilty of the murder of his wife, and that he knew no more about said death than he told at the trial."

Subsequent to the filing of the above pre-trial order, counsel for the parties filed a pre-trial order which constituted a stipulation of the issues which were before the Court. Those agreed upon issues are as follows:

"1. Was the arraignment of petitioner on a capital charge in the absence of his counsel, whose presence petitioner requested which request was refused, a violation of his constitutional rights?

"2. Was the ejectment of petitioner's counsel from the Cuyahoga County jail on August 1, 1954, thus depriving petitioner of counsel's advice, a violation of his constitutional rights?

"3. Did the refusal of the trial judge to grant motions for a continuance and/or a change of venue, in the face of massive prejudicial publicity, violate petitioner's constitutional rights?

"4. Was the publication of a list of veniremen thirty days in advance of trial, thus subjecting said veniremen to opinions of others during the thirty-day period, a violation of petitioner's constitutional rights?

"5. Did the trial judge, by failing to sequester the jurors during the trial in the face of continuing prejudicial publicity, violate petitioner's constitutional rights?

"6. Did the trial judge fail to adequately investigate the prejudicial effect of news stories during trial by questioning the jurors at the request of defense counsel?

"7. Was the action of the trial judge in setting aside the major portion of the courtroom for representatives of news media violative of petitioner's constitutional rights?

"8. Did the conduct of the Cleveland Press in reporting and editorializing the Sheppard Case pressure public officials to act against petitioner's interests, beyond the bounds of fairness, to an extent that violated petitioner's constitutional rights?

"9. Did the ruling of the trial judge, denying petitioner his last peremptory challenge, violate petitioner's constitutional rights?

"10. Did the action of the bailiffs in permitting the jurors, during deliberations and without authority from the court, to hold telephone conversations with persons outside the jury room, violate petitioner's constitutional rights?

1. It is a minor point, but the Court notes that several of the dates of decisions are incorrectly stated.

"11. Did the action of the police in seizing and holding petitioner's house, and excluding petitioner and his representatives from it for the duration of the trial, with the concurrence of the trial court, violate petitioner's constitutional rights?

"12. Was the refusal of the trial judge, as affirmed by the Court of Appeals of Cuyahoga County, to grant petitioner a new trial upon after-discovered evidence tending to show a third person in the murder room in corroboration of petitioner's defense, a violation of petitioner's constitutional rights?

"13. Did prosecuting authorities suppress relevant, substantial and material evidence in such a manner as to violate petitioner's constitutional rights?

"14. Did prosecuting authorities use improper and unfair tactics prior to and during trial in such a manner as to violate petitioner's constitutional rights?

"15. Did the trial judge, in permitting police officers to testify that petitioner had refused a lie-detector test, violate petitioner's constitutional rights?

"16. Did the trial judge, in permitting a witness named Houk to testify that he had taken a lie detector test, violate petitioner's constitutional rights?

"17. Did the Chief Justice of the Supreme Court of Ohio, in appointing his own replacement in violation of the Ohio Constitution to sit on petitioner's appeal, violate petitioner's constitutional rights?

"18. Did the action of the trial judge, in determining the unbiased condition of the jurors on their own assertions of fairness and impartiality, violate petitioner's constitutional rights?

"19. Did the Supreme Court of Ohio, in determining that there had been sufficient evidence to sustain the conviction, violate petitioner's constitutional rights?

"20. Did the Supreme Court of Ohio, in failing to pass upon all of the errors assigned by petitioner in his appeal, as required by Ohio Statutes, violate petitioner's constitutional rights?

"21. Were the courts of Ohio generally, in the handling of petitioner's trial and his several appeals, so prejudiced against him as to deprive him of his constitutional rights?

"22. Did the trial judge, in forcing the jury to deliberate for more than four days until it had reached a verdict, violate petitioner's constitutional rights?"

At a pre-trial conference after the filing of the above stipulation of issues, counsel for petitioner noted one further issue which the Court shall consider to be issue numbered 23:

"23. Did the trial judge, by failing to disqualify himself after making certain statements regarding petitioner's guilt, violate petitioner's constitutional rights?"

At a later date, it was stipulated by counsel that issues numbered 2, 13, 14 and 22 were consolidated with the remaining issues and need not be considered separately.

■ As a preliminary point, it should be noted that counsel for respondent has raised a question regarding this Court's jurisdiction to hear and determine issues numbered 1 and 15 because they have not been presented to the Ohio Courts for consideration. Counsel for respondent argues that petitioner can still, pursuant to Section 2953.05, Ohio Revised Code,[2]

---

2. Section 2953.05, Ohio Revised Code:
   "Appeal under section 2953.04 of the Revised Code, may be filed as a matter of right within thirty days after judgment and sentence or from an order overruling a motion for a new trial or an order placing the defendant on probation and suspending the imposition of sentence in fel-

request the Ohio Courts to consider these issues.

This argument ignores the fact that petitioner did appeal his conviction through the Ohio Courts and if he were now to request that they consider issues numbered 1 and 15 the probable result would be a refusal because he failed to raise those issues on appeal and therefore waive his right to have them determined.

It is not necessary for this Court to trace the development of the jurisdiction of a federal district court to review, by a federal habeas corpus proceeding, a state court conviction; that has recently been done by the United States Supreme Court in Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). A reading of the majority opinion in that case leaves no doubt but that this Court has jurisdiction to consider each allegation as to violation of petitioner's federal constitutional rights. Note, especially as to issues numbered 1 and 15, the following language in Fay v. Noia, supra, at page 428, 83 S.Ct. at page 843:

"* * * A defendant by committing a procedural default may be debarred from challenging his conviction in the state courts even on federal constitutional grounds. But a forfeiture of remedies does not legitimize the unconstitutional conduct by which his conviction was procured. * * *"

The fundamental question before the Court, as illustrated by the stated issues, is whether petitioner was afforded his right to a fair trial as required by the due process clause of the Fourteenth Amendment to the United States Constitution which provides: "nor shall any State deprive any person of life, liberty, or property, without due process of law."

■ It is at this point that the Court wishes to state exactly what is to be decided. The Court will consider whether or not petitioner received a fair trial. The guilt or innocence of petitioner is *not* before the Court and is, in fact, wholly immaterial to the question to be decided.[3]

■ The concepts of due process and fair trial are not susceptible to exacting definitions. This case must necessarily rest upon its particular facts, but of course, there are a number of cases which have considered these concepts and the Court will refer to them as its guideposts. And using these guideposts, the Court will consider the following:

1. Was the newspaper publicity before trial and/or during trial such that it violated petitioner's constitutional rights? (issues numbered 3, 4, 5, 6, 7 and 8);

2. Did the trial judge, by failing to disqualify himself after making certain statements regarding petitioner's guilt, violate petitioner's constitutional rights? (issue numbered 23);

3. Did the trial judge, in permitting police officers to testify that petitioner had refused a lie detector test (issue numbered 15) and in permitting a witness named Houk to testify that he had taken a lie detector test (issue numbered 16), violate petitioner's constitutional rights? and

4. Did the action of the bailiffs in permitting the jurors, during deliberations and without authority from the court, to hold telephone conversations with persons outside the jury room, violate petitioner's constitutional rights? (issue numbered 10).

---

ony cases, whichever is the latter. Appeals from judgments or final orders as above defined in magistrate courts shall be taken within ten days of such judgment or final order. After the expiration of the thirty day period or ten day period as above provided, such appeal may be taken only by leave of the court to which the appeal is taken. An appeal may be taken to the supreme court by

giving notice as provided by law and rule of such court within thirty days from the journalization of a judgment or final order of the court of appeals in all cases as provided by law."

3. Issue numbered 19, which goes to the question of whether there is sufficient evidence to sustain the conviction, will not be considered by the Court.

*Was the publicity before trial and/or during trial such that it violated petitioner's constitutional rights?* (issues numbered 3, 4, 5, 6, 7 and 8). With regard to this issue, counsel have submitted into evidence, by agreement, the following documents, materials and stipulated facts:

1. A copy of the petition for a writ of certiorari to the United States Supreme Court, Sheppard v. Ohio, 1956, 352 U.S. 910, 77 S.Ct. 118, 1 L.Ed.2d 119 and the Appendix to that petition. There was, of course, no stipulation as to the accuracy, factual or legal, of the allegations and arguments contained in the petition. However, it was agreed that the exhibits reproduced in the Appendix accurately portrayed the documents and materials which they purported to represent.

2. Pages 3723 to 3725, pages 4266 to 4268 and pages 5427 to 5430 of the Bill of Exceptions.

3. Five volumes of green covered scrap books of news clippings from the Cleveland Press, the Cleveland News (which has since merged with the Cleveland Press) and the Cleveland Plain Dealer. These scrap books contain substantially all of the clippings relating to the Sheppard case which were published by these three newspapers during the period from July 1954 through December 1954.

4. The fact that there was published in all three Cleveland newspapers previously referred to, and particularly on September 23, 1954, 25 days before the selection of a jury began, a list of 75 veniremen who had been drawn as prospective jurors in the Sheppard Case, giving the full name and street address of each juror listed.

5. The fact that the 13 petit jurors who heard the evidence and decided petitioner's case were allowed to go to their homes each night during the trial, and were not sequestered or kept apart until after the court's charge, at which time the jury was committed to the custody of two bailiffs and were thereafter kept under constant guard and supervision during their deliberations and until their verdict had been returned in open court.

6. The fact that the trial judge, before the commencement of the trial, made certain arrangements with respect to the seating whereby a major portion of the courtroom where the case was to be tried was assigned to the news media.

Prior to commencement of trial, counsel for petitioner made a number of motions for change of venue or for continuance. The trial judge held these motions in abeyance until after the jury was selected; after which he overruled each of the motions.

*Newspaper publicity before trial.* The first question to be considered is whether the trial judge erred in overruling the aforesaid motions and proceeding with trial in view of the newspaper publicity before trial. It would be impractical to quote each newspaper article which bears upon this question; therefore, the Court will set forth only those articles and headlines which it believes to be most relevant:

"STATE PREPARES CHARGE AGAINST BAY MURDERER"

"NEW SEARCH IS ORDERED FOR CLEWS"

" 'The state is already preparing its case against the killer of Mrs. Marilyn Sheppard.'

"This statement was made today by Assistant County Prosecutor John J. Mahon as he directed a surprise new search of the Bay Village home in which the 30-year-old clubwoman was beaten to death Sunday morning.

"Mahon sharply criticized the refusal of relatives to permit the immediate questioning of the victim's husband, Dr. Samuel Sheppard, also 30.

"While the prosecutor spoke, Dr. Sheppard, his injured neck supported by a brace, was being taken out of Bay View Hospital in a wheelchair to attend his wife's funeral * *."

Cleveland Press, July 7, 1954, p. 1.

## "TESTIFY NOW IN DEATH, BAY DOCTOR IS ORDERED"

"A forthwith subpena commanding Dr. Sam Sheppard, husband of the clain [sic] Bay Village woman, to appear at the county prosecutor's office for questioning was issued today.

"It was hastily issued by Coroner Samuel R. Gerber following a session at the doctor's bedside in Bay View Hospital.

"Deputy Sheriff Carl Rossbach entered the injured osteopath's room in the hospital which is operated by his family, in an effort to question him about the events leading to his wife's death.

"William J. Corrigan, Cleveland criminal defense attorney retained by Dr. Sheppard's family, went in, too.

"A few minutes later, Rossbach stalked out and reported to Coroner Gerber.

"Dr. Gerber angrily wrote out the subpena and handed it to Rossbach. 'Serve it forthwith,' he commanded.

"Rossbach went back into the room to attempt to resume the interrogation.

"The dramatic development came immediately after Assistant County Prosecutor John J. Mahon took control of the murder investigation and issued an abrupt ultimatum:

"Dr. Sheppard must come downtown to the prosecutor's office 'voluntarily to make a statement concerning the crime.'

"If the osteopath refuses, Mahon said, a coroner's inquest will be convened at the Morgue immediately, and Dr. Sheppard will be subpenaed and compelled to testify.

" * * * These developments came as Dr. Stephen Sheppard brother-in-law of the clain [sic] clubwoman, told reporters that his brother was eager and anxious to aid the investigation and was not physically able to withstand questioning.

"He added that William J. Corrigan, prominent Cleveland criminal defense lawyer retained by the family, was 'in complete charge from now on.'

" * * *

" 'In my twenty-three years of criminal prosecution, I have never seen such flagrant stalling as in this case by the family of Dr. Samuel Sheppard,' Mahon said.

" * * *."

Cleveland Press, July 8, 1954, p. 1.

## "DOCTOR RE-ENACTS STORY OF MURDER; REJECTS LIE TEST"

"Doctor Samuel H. Sheppard declined to submit to a lie detector test for questioning about the slaying of his attractive wife, it was disclosed today * * *."

Cleveland News, July 9, 1954, p. 1.

## "DOCTOR RE-ENACTS TRAGEDY"

## "HE BARS LIE TEST FOR PRESENT"

"Flanked by two attorneys Dr. Samuel H. Sheppard today re-enacted his version of the murder of his pretty wife, Marilyn—and repeated it, detail by detail, word for word, over and over again.

"Earlier he had refused for the second time to take a lie detector test in 'my present emotional state.'

" * * *."

Cleveland Press, July 9, 1954, p. 1.

## "TOO MUCH TIME LOST"

"Within memory no murder case in this part of the country has prompted so much discussion or speculation as that of Mrs. Sheppard.

"A good part of it centers quite naturally around the circumstances of the killing itself—in a quiet sub-

urban setting—and its attendant mysterious elements.

"A good part likewise centers around the protecting ring set up by members of the Sheppard family, which in some respects has tended to add to rather than subtract from the speculation that has expanded the case to such vast proportions.

"Also the apparent fumbling of investigative authorities on both the municipal and county levels has added to the intensity of interest—and has raised many additional questions.

---

"Any time a factor of special attention, or privilege, or special protection is introduced into any case it is bound to produce increased and critical attention.

"In the Sheppard murder case many of these factors are present against the original background of mystery, and it is therefore not unnatural that it occupies such intense and critical notice around the whole community.

"But the principal problem is the fact, that, for whatever reasons, the investigative authorities were slow in getting started, fumbling when they did, awkward in breaking through the protective barriers of the family, and far less aggressive than they should have been in following out clews, tracks, and evidence.

"There is nothing that helps block a solution to a murder more than a cold trail, and it is this, as much as anything, that causes such wide critical appraisal of the Sheppard case.

"Now that the investigative authorities appear finally to have catalyzed themselves into action and broken through some of the protective barriers, they ought to make up in redoubled effort the time they have already lost."

Cleveland Press, July 9, 1954, p. 14.

"QUIZ DOCTOR FOR 7 HOURS"
" * * *

"Deputy Sheriff Carl Rossbach renewed his demand that the 30-year old osteopath submit to a lie detector test.

" 'He doesn't have to if he doesn't want to,' Rossbach said, 'but I intend to keep on asking until he agrees.'
" * * * *."
Cleveland Press, July 10, 1954, p. 1.

---

"DOCTOR CALLS SECOND LIE TEST REFUSAL FINAL"
" * * *

"Dr. Samuel H. Sheppard again late yesterday refused to take a lie detector test in the investigation of the brutal murder of his pretty wife, Marilyn.

"Assistant County Prosecutor Thomas J. Parrino told reporters at the end of a nine-hour questioning of Dr. Sheppard: 'I felt that he was now ruling it out completely.'
" * * * *."
Cleveland Plain Dealer,
July 11, 1954, p. 1

---

"PUSHES FOR SHEPPARD
LIE TEST"

"DOCTOR IS WELL ENOUGH
NOW, GERBER SAYS"

"Still on the trial of the elusive motive for the murder of Mrs. Marilyn Sheppard 10 days ago, investigators today concentrated on a possible 'other woman' angle.

"AT THE SAME TIME, CORONER SAMUEL R. GERBER AGAIN URGED THE SLAIN WOMAN'S HUSBAND, DR. SAMUEL H. SHEPPARD, BAY VILLAGE OSTEOPATH, TO SUBMIT TO A LIE DETECTOR TEST.

" 'If Dr. Sheppard has recovered sufficiently to go back to work at the Bay View Hospital he is well enough

to take a lie detector test,' Dr. Gerber said.

" * * *."

Cleveland News, July 13, 1954, p. 1.

---

"PAINESVILLE WOMAN'S STORY OPENS NEW SHEPPARD QUIZ"

"SAYS DOCTOR'S WIFE WANTED TO GET DIVORCE"

"A Painesville woman late today sent police off at a new tangent in their search for the mysterious slayer of Mrs. Marilyn Sheppard.

"THE NEW WITNESS IN THE MURDER CASE WAS MRS. JESSIE DILL, 23, MOTHER OF TWO CHILDREN. SHE WAS QUESTIONED IN THE PAINESVILLE POLICE STATION FOR TWO HOURS BY BAY VILLAGE POLICE.

"Mrs. Dill told reporters she had met a woman she is positive was Marilyn Sheppard on the beach at Fairport Harbor Monday, June 14.

" 'She seemed to be unhappy and asked me where my husband was,' Mrs. Dill said. 'I told her I was divorced and she said "that's what I ought to do." She said she had attempted to divorce her husband in California four years ago but his relatives had talked her out of it.'

"Mrs. Dill gave police and reporters the name of a man mentioned by the woman she identified as Mrs. Sheppard. The man had not previously entered the murder investigation.

"Mrs. Dill said the women [sic] she identified as Mrs. Sheppard told her she was to have a baby, and she was afraid if she divorced her husband her 7-year-old son, Chip, would be taken away from her.

" * * *."

Cleveland News, July 15, 1954, p. 1.

"THE FINGER OF SUSPICION"

"The worst thing about the tragic mishandling of the Sheppard murder investigation is the resulting suspicion.

"Why was it mishandled, people ask.

"You can't blame them.

---

"In this community generally, murder investigations are conducted with intelligence, efficiency and impartiality.

"The record is good.

"The detectives on the Homicide Squad in the Cleveland Police Department, for instance, know their job. They have a national reputation.

"Same with the coroner.

"Thanks to his close co-operation with Western Reserve University, and thanks to the voters who authorized the best equipment and facilities, the county has top standing in the relatively new field of scientific crime investigation.

"And the sheriff's office and the prosecutor's office both have good reputations for integrity and determination in solving crimes.

---

"What happened, then?

"Two things stood in the way of the usual complete and unfettered investigation that the citizens of Greater Cleveland have come to expect as the natural course of events.

"ONE was the hostility of Bay Village officials to any 'outsiders' in this case.

"They rebuffed the usual assistance immediately offered by Cleveland police experts in solving murders.

"SECOND was the unusual protection set up around the husband of the victim, the sole witness, accord-

ing to later reports, who could start the investigation on the right track.

"The protection was twofold. It came from his family and it came from his lawyer. It was unusual; to say the least.

"And then, worst of all, no law enforcement official, Bay or county, took any leadership in the face of these unusual circumstances.

"No one.

"The result of all this fumbling and delay, of course, was to start gossip, to launch rumors, to spread suspicion thick as glue.

"It was bad for everybody. Everybody, that is, except the murderer.

---

"What can be done, now?

"It doesn't make much difference who runs the show. The important thing is that justice is done.

"First logical step would be a meeting of all the law enforcement agencies involved.

"Let them select a leader, a single responsible boss for this particular case.

"Let him serve notice that protection, special favors and fancy ultimatums by lawyers are out from here on.

"Maybe it's too late to start again.

"BUT EVERY FURTHER MOMENT OF FUMBLING IS HELPING A MURDERER ESCAPE."
Cleveland Press, July 16, 1954, p. 12.

"SHEPPARD SET FOR NEW QUIZ"

"GETTING AWAY WITH MURDER"

"AN EDITORIAL"

"What's the matter with the law enforcement authorities of Cuyahoga County?

"Have they lost their sense of reason?—or at least inexcusably set aside the realization of what they are hired to do, and for whom they work?

"If ever a murder case was studded with fumbling, halting, stupid, uncooperative bungling-politeness to people whose place in this situation completely justified vigorous searching, prompt and effective police work—the Sheppard case has them all.

"Was the murder of Mrs. Sheppard a polite matter?

"Did the killer make a dutiful bow to the authorities and then proceed brutally to destroy the young child-bearing wife?

"Why all of this sham, hypocrisy, politeness, criss-crossing of pomp and protocol in this case?

"Who is trying to deceive whom?

---

"From the very beginning of this case—from the first hour that the murder became known to the authorities by a telephone call from the husband to the town mayor—from that moment on and including this, the case has been one of the worst in local crime history.

"Of course the trail is cold. Of course the clews have been virtually erased by the killer. Of course the whole thing is botched up so badly that head or tail cannot be made of it.

"In the background of this case are friendships, relationships, hired lawyers, a husband who ought to have been subjected instantly to the same third-degree to which any other person under similar circumstances is subjected, and a whole string of special and bewildering extra-privileged courtesies that should never be extended by authorities investigating a murder—the most serious, and sickening crime of all.

"The spectacle of a whole community watching a batch of law enforcement officials fumbling around,

stumbling over one another, bowing and scraping in the presence of people they ought to be dealing with just as firmly as any other persons in any other crime—that spectacle is not only becoming a stench but a serious threat to the dignity of law enforcement itself.

---

"Coroner Sam Gerber was never more right than when yesterday he said that the killer must be laughing secretly at the whole spectacle—the spectacle of the community of a million and a half people brought to indignant frustration by Mrs. Sheppard's killer in that white house out in Bay Village.

"Why shouldn't he chuckle? Why shouldn't he cover up, shut up, conceal himself behind the circle of protecting people?

"What's the matter with us in Cuyahoga County? Who are we afraid of? Why do we have to kowtow to a set of circumstances and people where a murder has been committed?

---

"It's time that somebody smashed into this situation and tore aside this restraining curtain of sham, politeness and hypocrisy and went at the business of solving a murder—and quit this nonsense of artificial politeness that has not been extended to any other murder case in generations."

Cleveland Press, July 20, 1954, p. 1.

"ISN'T THIS MURDER WORTH AN INQUEST?"

And in a later edition, the same editorial was headlined:

"WHY NO INQUEST? DO IT NOW, DR. GERBER"

"AN EDITORIAL"

"Why hasn't County Coroner Sam Gerber called an inquest into the Sheppard murder case?

"What restrains him?

"Is the Sheppard murder case any different from the countless other murder mysteries where the coroner has turned to this traditional method of investigation?

"An inquest empowers use of the subpena.

"It puts witnesses under oath.

"It makes possible the examination of every possible witness, suspect, relative, records and papers available anywhere.

"It puts the investigation itself into the record.

"And—what's most important of all—it sometimes solves crimes.

"What good reason is there now for Dr. Gerber to delay any longer the use of the inquest?

"The murder of Marilyn Sheppard is a baffling crime.

"Thus far it appears to have stumped everybody.

"It may never be solved.

"But, this community can never have a clear conscience until every possible method is applied to its solution.

"What, Coroner Gerber, is the answer to the question—

"Why don't you call an inquest into this murder?"

Cleveland Press, July 21, 1954, p. 1.

"TIME TO BRING BAY SLAYING INTO OPEN"

"Too many days have passed without positive results in the several investigations of the Bay Village hack-slaying. Undoubtedly the suburb's police officials feel they have conducted the best possible inquiry; county officials and Coroner Samuel R. Gerber's office also undoubtedly feel that they have acted effectively. But there's been no sign at all of breaking the stalemate over the brutal slaying of Mrs. Marilyn Sheppard.

"We are forced to take note that Dr. Samuel Sheppard, husband of the victim has rejected suggestions of both lie detector and truth serum tests, and has submitted to questioning only when his family and his lawyer have agreed he might.

"Before charges and counter-charges, fights among officials and jealousies smother all efficiency, wouldn't it be wise to bring the whole matter out into the open, with subpenaing and examination of witnesses under oath, for example, at the county's crime laboratory at Western Reserve University? It's time all groups get together as one to find, or attempt to find the solution to this baffling crime."

Cleveland News, July 21, 1954, p. 1.

## "GET THAT KILLER"

"It is high time that strenuous action be taken in the Sheppard murder case.

"This newspaper fails to see how bickering among those who have been investigating the 18-day-old mystery can aid in the final aim—to find the murderer, whoever he may be.

"County Coroner Samuel R. Gerber, though he has failed to produce the person who brutally murdered Mrs. Marilyn Sheppard in the bedroom of her Bay Village home, has worked long and hard, and deserves the appreciation of the whole community.

"But it is obvious that Dr. Gerber needs help. The Cleveland police department is equipped to give it. Its crime laboratories and investigators are among the best in the business. It has no Bay Village friendships which might prove embarrassing.

"True, the case is cold as ice. There has, in our opinion, been a noticeable lack of cooperation on the part of the dead woman's husband, Dr. Samuel M. [sic] Sheppard, who has refused to take a lie detector test, and who yesterday rejected proposals that he submit to a 'truth serum' test.

"He had already been subjected to interrogation, he said; he could not face further interrogation because he is still emotionally upset, and he was reluctant to put himself in a position where he might involuntarily incriminate innocent people.

"The last noble sentiment would, we feel, have been far more noble if Dr. Sheppard had said:

" 'I will be happy to do anything within my power to bring my wife's murderer to justice. If a lie detector test would help, by all means bring it on. If a "truth serum" test would convince you that I have told police all I know in an honest effort to apprehend the murderer, I am at your service, gentlemen.'

"Just as it is easy to 'second-guess' a ball game, it is easy to second-guess a murder investigation.

"It is clear, now, that, because of the social prominence of the Sheppard family in the community, and friendships between the principals in the case and the law enforcement bodies of Bay Village, kid gloves were used throughout all preliminary examinations.

"Possibly the 'bushy-haired man' would have been apprehended long before this if the crime had been investigated with the vigor it deserved; perhaps some other answer might have been found to solve one of the most brutal murders in the history of Greater Cleveland.

"It is gratifying that the Cleveland police department has accepted the Bay Village Council's invitation to step into the mystery, even at this late date, after once dropping out of the case for some unexplained reason. Competent detectives may yet be able to muster enough evidence to produce the killer.

"Finding the killer should be of the greatest satisfaction to Greater Cleveland, to Bay Village, and to Dr. Samuel Sheppard."

Cleveland Plain Dealer,
July 22, 1954, p. 1.

## "SLAIN WIFE REVEALED DATES OF DOCTOR, TALK OF DIVORCE"

" * * *

"The audience of more than 200, mostly Bay Village housewives, applauded when William Corrigan, Dr. Sam's attorney, was forcibly ejected from the hearing after insisting vigorously on his right to insert remarks in the record.

"Coroner Samuel R. Gerber, who ordered Corrigan's expulsion, was hugged, kissed and cheered by the spectators after he recessed the three-day hearing to be reconvened later at the County Morgue * *."

" * * *."

Cleveland Press, July 26, 1954, p. 1.

---

## "CORRIGAN EJECTED AMID CHEERS"

## "MOVE FOLLOWS RUNNING CLASH WITH GERBER"

## "INQUEST IS RECESSED; OUSTED LAWYER VOWS TO SUE OVER INCIDENT"

"Spectators cheered wildly yesterday as William J. Corrigan, criminal lawyer representing Dr. Samuel H. Sheppard, was half dragged from the room in the closing moments of the Marilyn Sheppard murder inquest in Bay Village.

"As the tumult subsided in the Normandy School auditorium-gymnasium, Coroner Samuel R. Gerber indefinitely recessed the inquiry into the brutal hack-murder of Dr. Sheppard's 31-year-old wife before dawn July 4.

" * * *."

Cleveland Plain Dealer,
July 27, 1954, p. 1.

## "WHY DON'T POLICE QUIZ TOP SUSPECT?"
## "AN EDITORIAL"

"You can bet your last dollar the Sheppard murder would be cleaned up long ago if it had involved 'average people.'

"They'd have hauled in all the suspects to Police Headquarters.

"They'd have grilled them in the accepted, straight-out way of doing police business.

"They wouldn't have waited so much as one hour to bring the chief suspect in.

"Much less days.

"Much less weeks.

"Why all this fancy, high-level bowing and scraping, and super-cautious monkey business?

---

"Sure it happened in suburban Bay Village rather than in an 'ordinary' neighborhood.

"So what?

"What difference should that make?

"When they called the Cleveland police in everybody thought:

" 'This is it. Now they'll get some place.'

"Now we'd have vigorous, experienced, expert, big-time action.

"They'd get it solved in a hurry.

"They'd have Sam Sheppard brought in, grill him at Police Headquarters, like the chief suspect in any murder case.

"But they didn't.

"And they haven't.

"In fairness, they've made some progress.

"But they haven't called in Sam Sheppard.

"Now proved under oath to be a liar, still free to go about his business, shielded by his family, protect-

52

ed by a smart lawyer who has made monkeys of the police and authorities, carrying a gun part of the time, left free to do whatever he pleases as he pleases, Sam Sheppard still hasn't been taken to Headquarters.

"What's wrong in this whole mess that is making this community a national laughing stock?

"Who's holding back—and why?

"What's the basic difference between murder in an 'ordinary' neighborhood and one in a Lake Rd. house in suburban Bay Village?

"Who is afraid of whom?

"It's just about time that somebody began producing the answers—

"And producing Sam Sheppard at Police Headquarters."

Cleveland Press, July 28, 1954, p. 1.

**Handcuffs on the Wrong People?**

Cleveland Press, July 29, 1954, p. 1.

"I Will Do Everything in My Power to Help Solve This Terrible Murder."
—*Dr. Sam Sheppard*

Cleveland Plain Dealer, August 5, 1954.

"WHY ISN'T SAM SHEPPARD
IN JAIL?"

And in a later edition the headlines were:

"QUIT STALLING—BRING
HIM IN"

"AN EDITORIAL"

"Maybe somebody in this town can remember a parallel for it. The Press can't.

"And not even the oldest police veterans can, either.

"Everybody's agreed that Sam Sheppard is the most unusual murder suspect ever seen around these parts.

"Except for some superficial questioning during Coroner Sam Gerber's inquest he has been scot-free of any official grilling into the circumstances of his wife's murder.

"From the morning of July 4, when he reported his wife's killing, to this moment, 26 days later, Sam Sheppard has not set foot in a police station.

"He has been surrounded by an iron curtain of protection that makes Malenkov's Russian concealment amateurish.

"His family, his Bay Village friends—which include its officials —his lawyers, his hospital staff, have combined to make law enforcement in this county look silly.

"The longer they can stall bringing Sam Sheppard to the police station the surer it is he'll never get there.

"The longer they can string this whole affair out the surer it is that the public's attention sooner or later will be diverted to something else, and then the heat will be off, the public interest gone, and the goose will hang high.

"This man is a suspect in his wife's murder. Nobody yet has found a solitary trace of the presence of anybody else in his Lake Rd. house the night or morning his wife was brutally beaten to death in her bedroom.

"And yet no murder suspect in the history of this county has been treated so tenderly, with such infinite solicitude for his emotions, with such fear of upsetting the young man.

"Gentlemen of Bay Village, Cuyahoga County, and Cleveland, charged jointly with law enforcement—

"THIS IS MURDER. THIS IS NO PARLOR GAME. THIS IS NO TIME TO PERMIT ANYBODY— NO MATTER WHO HE IS—TO OUTWIT, STALL, FAKE, OR IMPROVISE DEVICES TO KEEP AWAY FROM THE POLICE OR FROM THE QUESTIONING ANYBODY IN HIS RIGHT MIND KNOWS A MURDER SUSPECT SHOULD BE SUBJECTED TO— AT A POLICE STATION."

"The officials throw up their hands in horror at the thought of bringing Sam Sheppard to a police station for grilling. Why? Why is he any different than anybody else in any other murder case?

"Why should the police officials be afraid of Bill Corrigan? Or anybody else, for that matter, when they are at their sworn business of solving a murder.

"Certainly Corrigan will act to protect Sam Sheppard's rights. He should.

"BUT THE PEOPLE OF CUYAHOGA COUNTY EXPECT YOU, THE LAW ENFORCEMENT OFFICIALS, TO PROTECT THE PEOPLE'S RIGHTS.

"A murder has been committed. You know who the chief suspect is.

"You have the obligation to question him—question him thoroughly and searchingly—from beginning to end, and not at his hospital, not at his home, not in some secluded spot out in the country.

"But at Police Headquarters— just as you do every-other person suspected in a murder case.

"What the people of Cuyahoga County cannot understand, and The Press cannot understand, is why you are showing Sam Sheppard so much more consideration as a murder suspect than any other person who has ever before been suspected in a murder case.

"Why?"

Cleveland Press, July 30, 1954, p. 1.

"BUT WHO WILL SPEAK FOR MARILYN?"

"It's perfect, you think at first, as you look over the setting for the Big Trial.

"The courtroom is just the size to give a feeling of coziness and to put the actors close enough to each other

so that in moments of stress the antagonists can stand jaw to jaw and in moments of relaxation can exchange soft words of camaraderie.

"Modern enough for this 'See-Hear' age, with the microphone, the loud speakers on the walls, and the blazing lights for the TV cameras before and after court sessions.

"Yet somberly dignified enough to carry the authentic decor of the traditional court of justice.

"Almost inadequate, old-fashioned hanging light fixtures. Dark furnitture. [sic]. A high bench for his honor, the judge. So high that if he slouches a bit just his head is visible.

"A bit of plaster has fallen from the ceiling over the clerk's desk. The unrepaired spot gives a touch of the dignity of age.

"And on the floor at the end of the trial table—a cuspidor.

"Ah, you think, only a master arranger would have remembered that.

" 'The cuspidor. Put it here.'

"Perfect, you think at first, a masterpiece of setting the stage for the dramatic action of the Big Trial.

"Then it hits you. No, there's something missing.

"What?

---

"Can what seems to be missing be found in the cast of characters.

"Ah, the cast. Superb, you think at first.

"And complete. Not a character missing.

"And so real, you think. Just like you would expect to see. Why if you didn't know these were people and this was a real setting you would think you were watching a drama on television or a mystery play at a theater.

"His honor, the judge. A quaint Welsh accent. Quick, mobile features that can pass so rapidly through sternness, annoyance, patience and charming friendliness.

"And the chief counsel for the defense. Granite faced, shaggy haired. Now disdainful, now quizzical, now disbelieving, now coaxing, now threatening, now bored.

"These provide the perfect background for the most perfect character of all—the accused. Was there ever more perfect typing? Was there ever a more perfect face for the enigma that is the Big Trial?

"Study that face as long as you want. Never will you get from it a hint of what might be the answer when the curtain rings down on this setting and on these characters. Is he the one? Did he do it?

"Plus of course, the other characters. The accused's two brothers. Prosperous, poised. His two sisters-in-law. Smart, chic, well-groomed. His elderly father. Courtly, reserved. A perfect type for the patriarch of a staunch clan.

"Yes, you think. They wouldn't be more true-to-life if this Big Trial were a television drama.

"Then it hits you again. No there's something—and someone missing.

"What is it? Who is it? Who's still off stage? Waiting perhaps for a cue to come on.

---

"In the hallway outside the courtroom you stop to talk to Detective Chief James McArthur. He's an old timer at Big Trials. So you ask him. Isn't there someone, something missing?

" 'Sure,' says the detective chief. 'There always is. I'll tell you.

" 'It's the other side, the representatives of what in this case will be officially known as the corpus delicti, in other words, the body of the crime, in still other words—Marilyn Reese Sheppard.

" 'There is no grieving mother— she died when Marilyn was very young.

" 'There's no revenge-seeking brother nor sorrowing sister. Marilyn was an only child.

" 'Her father is not here. Why he isn't, is his own personal business.'

"What then, you wonder, will be the other side.

"It will be there, Inspector Mc-Arthur reassures. He opens a thick brief case he carries daily to the court-room.

" 'Here,' he says, 'are the statements and resumes of testimony that will be given by state's witnesses. Here are the theories and details of the evidence found by dozens of detectives in weeks of work.

" 'Here is the complete story of Marilyn Reese Sheppard. How she lived, how, we think, she died. Her story will come into this courtroom through our witnesses. Here is how it starts: Marilyn Sheppard, nee Reese, age 30, height 5 feet, 7 inches, weight 125 pounds, brown hair, hazel eyes. On the morning of July 4 she was murdered in her bedroom. * * *'

"Then you realize how what and who is missing from the perfect setting will be supplied.

"How in the Big Case justice will be done.

"Justice to Sam Sheppard.

"And to Marilyn Sheppard."
Cleveland Press, October 23, 1954,
p. 1.

[This article is included with "Newspaper publicity before trial" although it is recognized that the trial had commenced before it was published; however, the jury had not yet been sworn and the court believes this article to be relevant to the question being considered].

ADDITIONAL NEWSPAPER HEAD-LINES: Published before trial, most of which appeared on front pages.

"QUIT WEARING GUN, DOCTOR TOLD"

"DR. SHEPPARD BACKS AWAY FROM 'CRIME DOCTOR' TALK"

"SAYS MRS. SHEPPARD HAD PLANNED DIVORCE"

"SHEPPARD DENIES TRYST WITH WOMAN TECHNICIAN"

"SHEPPARD DENIES AFFAIR, SOBS ON WITNESS STAND"

"KERR URGES ARREST OF DOCTOR; POLICE FIND HOLES IN STORY"

"SLAIN WIFE TALKED OF 'OTHER GIRL,' DOCTOR'S MOTHER SAYS"

"GIRL ADMITS AFFAIR, FLIES HERE TO TESTIFY"

"DOCTOR LIES, SUSAN SAYS; TELLS OF GIFTS"

"DR. SAM MADE LOVE BUT DIDN'T TALK ABOUT DIVORCE, SUSAN SAYS"

"STORY OF TECHNICIAN DIFFERENT FROM SHEPPARD'S AT INQUEST"

"DR. SAM FACES QUIZ AT JAIL ON MARILYN'S 'FEAR OF HIM' "

"15 DETECTIVES GRILL DR. SHEPPARD IN JAIL"

"POLICE ASSERT COUPLE HAD VIOLENT ROWS"

"SCIENCE CUTS THROUGH COVER-UP"

"POLICE END QUIZ AS DOCTOR WINS NO-TALK STRIKE"

"DOCTOR BALKS, QUIZ HALTED"

"5 'OTHER WOMEN' LINKED TO DOCTOR"

"SIXTH WOMAN IS LINKED IN DOCTOR QUIZ"

"[GRAND] JURY WEIGHS EVIDENCE 40 MINUTES AND ACTS"

"THE SHEPPARD STORY: MURDER MYSTERY FULL OF CONTRADICTIONS"

The Court does not deem it necessary to analyze in detail the above quoted newspaper editorials, articles and headlines or the remainder of the five volumes of clippings submitted into evidence. Suffice it to say that each of the three Cleveland newspapers repeatedly printed material which strongly suggested and, in fact, urged petitioner's guilt. Indicative of the suggestion of guilt was the repeated and extensive coverage given to petitioner's refusal to submit to a lie detector test or to receive an injection of truth serum. Headlines, in addition to those already referred to but still only a sampling of the total, stated:

"DOCTOR VARIES STORY, BARS LIE TEST NOW,"

"DR. SHEPPARD REFUSES TO TAKE TRUTH SERUM IN MURDER PROBE,"

"DOCTOR BARS TRUTH TEST," and

"DR. SHEPPARD BALKS AT TRUTH SERUM TEST."

And particular mention must be made of the editorial in the Cleveland Press titled "BUT WHO WILL SPEAK FOR MARILYN" which was printed just prior to the swearing in of the jury, for it was indeed one of the most prejudicial. Ignoring the fact that it was a cheap, sobsister editorial, it literally screamed for petitioner's conviction.

When the Supreme Court of Ohio considered the question of whether the trial court should have granted a change of venue, Ohio v. Sheppard, 165 Ohio St. 293, 294–297, 135 N.E.2d 340, 342–343 (1956) the majority opinion of the Court stated:

" * * * Was the atmosphere in Cleveland as a result of the widespread publicity attendant upon this trial such as to require the trial court to grant a change of venue?

" * * * *

"The law does not require this court to be so naive as to refuse to recognize the great amount of publicity accorded this case from the time of the discovery of the crime up to the present time. Every development has been given the 'full treatment' by the press, radio and television. The interest in each phase of the case has not been confined to the Cleveland area or to Ohio. Syndicated columns and news agency reports have made the case almost as well known in every community of the nation as it is in Cleveland.

"It should be borne in mind, however, that the legal question presented to us is whether the defendant was accorded a fair constitutional trial by an impartial jury which could decide the issues of fact solely upon the consideration of the evidence in the light of the law given it by the court. That question is not to be decided on the volume of the publicity or the tendency such publicity may have had in influencing the public mind generally as to the defendant's guilt or innocence.

" * * * *

"We believe the trial court was justified in those rulings (the overruling of each motion for change of venue). In Townsend v. State, 17 Ohio Cir.Ct.R.,N.S., 380, 25 Ohio Cir.Dec. 408, affirmed without written opinion in 88 Ohio St. 584, 106 N.E. 1083, it is said:

" 'The examination of jurors on their *voir dire* affords the best test as to whether or not prejudice exists in the community against the defendant; and where it appears that the opinions as to the guilt of the defendant of those called for examination for jurors are based on newspaper articles and that the opinions so formed are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue.'

" * * * *

"If the jury system is to remain a part of our system of jurisprudence,

the courts and litigants must have faith in the inherent honesty of our citizens in performing their duty as jurors courageously and without fear or favor. Of the 75 prospective jurors called pursuant to this venire only 14 were excused because they had formed a firm opinion as to the guilt or innocence of the defendant. A full panel was accepted before this venire was exhausted, and defendant exercised but five of his allotted six peremptory challenges.

"In the light of these facts, and particularly in the light of the fact that a jury was impaneled and sworn to try this case fairly and impartially on the evidence and the law, this court can not say that the denial of a change of venue by the trial judge constituted an abuse of discretion."

■■ The general rule that a change of venue lies within the sound discretion of the trial judge is well settled. The Courts have also agreed that our jury system is based upon the belief of jurors and when jurors testify that they can discount influences of external factors and meet the standard imposed by the Fourteenth Amendment, that assumption is not lightly to be disregarded, Rideau v. Louisiana, 373 U.S. 723, 83 S. Ct. 1417, 10 L.Ed.2d 663 (1963). However, and this is a factor which the Supreme Court of Ohio failed to consider, when the circumstances are unusually compelling, the assurances of jurors may be disregarded, though the burden of showing essential unfairness is upon the person who claims such injustice and seeks to have the results set aside, Rideau v. Louisiana, supra, and Adams v. United States ex rel. McCann, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942).

How to protect an accused from the prejudicial effect of newspaper publicity is indeed a serious and difficult problem. The United States Supreme Court has jealously guarded the right of an accused to a fair trial by a panel of impartial jurors and when, after a conviction, it is determined that newspaper publicity so prejudiced the minds of the prospective jurors as to preclude a fair trial, the Court has ordered a new trial. That Court has, of course, recognized that jurors do not live in a vacuum and certain cases are by their very nature apt to generate publicity and jurors will probably have formed some impression or opinion as to the merits of the case. This problem was discussed by the Court in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). In that case, a habeas corpus proceeding was brought to test the validity of petitioner's conviction of murder and sentence of death in the Circuit Court of Gibson County, Indiana. Petitioner contended that his conviction had been obtained in violation of the Fourteenth Amendment in that he did not receive a fair trial. Mr. Justice Clark, in delivering the opinion of the Court stated at pages 722–723, 81 S.Ct. at pages 1642–1643:

" * * * In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. * *

"It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impres-

sion or opinion and render a verdict based on the evidence presented in court. * * *"

The Court, after noting that the jury panel consisted of 430 persons of which the trial judge excused 268 on challenges for cause as having fixed opinions as to the guilt of the defendant, stated at page 727, 81 S.Ct. at page 1645:

"* * * An examination of the 2,783-page *voir dire* record shows that * * * almost 90% of those examined on the point * * * entertained some opinion as to guilt—ranging in intensity from mere suspicion to absolute certainty. * * *"

The Court then concluded:

"Here the 'pattern of deep and bitter prejudice' shown to be present throughout the community * * * was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. * * *"

And Mr. Justice Frankfurter in his concurring opinion, at pages 729–730, 81 S.Ct. at page 1646, observed:

"* * * One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him. How can fallible men and women reach a disinterested verdict based exclusively on what they heard in court when, before they entered the jury box, their minds were saturated by press and radio for months preceding by matter designed to establish the guilt of the accused. A conviction so secured obviously constitutes a denial of due process of law in its most rudimentary conception."

This Court, though it recognizes that in the instant case only 14 of the 72 prospective jurors examined stated that they had prejudged the guilt or innocence of the accused, has no compunction in finding that the publicity was so prejudicial to petitioner that the assurances of the jurors must be disregarded for in the words of Mr. Justice Frankfurter, "before they [the jurors] entered the jury box, their minds were saturated by press and radio * * * designed to establish the guilt of the accused."

In a case decided after Irvin v. Dowd, supra, the Supreme Court held it was a denial of due process of law to refuse the request for a change of venue after the people of the community had been exposed repeatedly and in depth to the spectacle of the defendant personally confessing in detail to the crimes with which he was later charged, Rideau v. Louisiana, supra. In that case, the Court did not examine the transcript of the voir dire in reaching its determination as to prejudice. The Court said at page 727 of 373 U.S., at page 1419 of 83 S.Ct.:

"* * * we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised 'interview.' * * *"

The instant case is analogous to Rideau in that regardless of what might have been said in the voir dire examination, the community was so prejudiced against petitioner that a fair trial could not be had. See, as one overt example of the prejudice against petitioner, the newspaper reports that the "spectators cheered wildly" and "hugged and kissed" the coroner when he ordered petitioner's counsel ejected from the inquest, supra at page 51.

As stated in Delaney v. United States, 199 F.2d 107, 112–113 (1 Cir. 1952) by Judge Magruder:

"* * * One cannot assume that the average juror is so endowed with

a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity. This is particularly true in the determination of issues involving the credibility of witnesses."

And as stated by Mr. Justice Jackson, concurring in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949):

"The naive assumption that prejudicial effects can be overcome by instructions to the jury, * * * all practicing lawyers know to be unmitigated fictions."

■ This Court now holds that the prejudicial effect of the newspaper publicity was so manifest that no jury could have been seated at that particular time in Cleveland which would have been fair and impartial regardless of their assurances or the admonitions and instructions of the trial judge.

*Publicity during trial.* From the day the trial began, the Sheppard case dominated the Cleveland newspapers. It would be impractical to quote extensively from the articles which were published during trial; the Court will present only one. It is indeed a glaring example of prejudicial reporting and appeared on page 1 of the Cleveland Press on November 24. The headlines were:

"SAM CALLED A 'JEKYLL-HYDE' BY MARILYN, COUSIN TO TESTIFY"

The text of the article stated:

"Two days before her death, murdered Marilyn Reese Sheppard told friends that her accused husband, Dr. Samuel H. Sheppard, was 'a Dr. Jekyll and Mr. Hyde.'

"The prosecution has a 'bombshell witness' on tap who will testify to Dr. Sam's display of fiery temper—countering the defense claim that the defendant is a gentle physician with an even disposition.

"One of Mrs. Sheppard's 'Dr. Jekyll and Mr. Hyde' statements was made to Bay Village Mayor J. Spencer Houk as recently as last June, The Press learned.

"Houk, according to his statement to the authorities, had expressed surprise at Marilyn's account of a display of Sam's anger.

" 'You don't know that guy,' he quoted the murder victim as replying. 'He's a regular Dr. Jekyll and Mr. Hyde. * * *'

"Mrs. Sheppard used the 'Jekyll-Hyde' expression frequently in confidential conversations during the past several years, friends and relatives have told the murder investigators.

"THE 'BOMBSHELL WITNESS' IS THOMAS WEIGLE, 26, OF 15897 NELAMERE RD., EAST CLEVELAND, MARILYN'S FIRST COUSIN.

"Weigle and his wife, Marian, and son, Gordon visited Sam and Marilyn Sheppard's home at 28924 Lake Rd., Bay Village, a Sunday in March, 1952.

"The two women were in the kitchen, Weigle related, while he and Dr. Sam were watching a western movie on television. The Sheppards' only son, Sam (Chip) Jr., then five years old, was playing in the room.

"Chip, Weigle said, tapped his father's arm—either playfully or accidentally.

" 'SAM'S FACE REDDENED,' WEIGLE CONTINUED. 'HE WHISKED THE BOY UP, TOSSED HIM ACROSS HIS LEGS, AND BEGAN BEATING HIM ON HIS BACK, LEGS AND BUTTOCKS.'

" 'AS HE STRUCK THE BOY REPEATEDLY, SAM SAID: "DON'T YOU EVER HIT ME

AGAIN. * * * DON'T YOU EVER DO THAT AGAIN!" * * *'

" * * *."

Thomas Weigle, or the "bombshell witness" as he was characterized by the Cleveland Press, did not testify, as that newspaper had said he would, that petitioner was a "Jekyll-Hyde." However, the damage to petitioner was completed when the newspaper was circulated. As stated by counsel for petitioner in his brief: "It is difficult to imagine any characterization more damaging to a doctor on trial for a monstrous murder." The schizophrenic character in Robert Louis Stevenson's novel was at times a peaceable, respected doctor and at times a bloodthirsty killer. The attempt to analogize petitioner and a schizophrenic murderer is only one example of the type of slanted and prejudicial newspaper publicity which attended the trial. Other examples are the following headlines:

"CALLS DR. SAM LOVE SLAYER, ASKS DEATH"

"MARILYN'S PICTURES STIR COURT"

"DEFENSE STRESSES 'HOW' NOT 'WHO' TO MARILYN'S DEATH"

"DEFENSE AIMS TO SET WALL OF DOUBT AROUND DR. SAM"

"DOCTOR SAM'S PROWLER STORY HIT"

"LAB MEN READY ATTACK ON SAM"

"DRENKHAN [A Patrolman] RIPS 'PROWLER' VIEW"

"STORY OF ILLICIT ROMANCE WILL CLIMAX TRIAL"

"STATE SPRINGS 2 BLOOD CLEWS"

"HIT DEFENSE 'BURGLARY' PLEA; * * *"

"CORONER IS FIRM UNDER CORRIGAN FIRE"

"CORRIGAN STRUGGLES TO REVIVE 'INTRUDER' AS RECALLED BY SAM"

"TESTIFIES SAM CHANGED STORIES"

"DR. SAM'S SIX STORIES SPIN TANGLED SKEIN"

"ASSERTS STEVE COACHED DR. SAM"

"STATE HITS DR. SAM ON 17 POINTS"

"SHEPPARD DEFENSE AIMED AT CHRISTMAS VERDICT"

"PARRINO RIPS DR. STEVE'S STORY OF SCENE ON MURDER MORNING"

"TRIPS DR. STEVE ON NEW VERSION OF LOOK AT BODY"

"TESTIMONY OF DR. STEVE SHOWS CHANGE IN STORY"

"DR. STEVE ADMITS 2 ERRORS"

"DR. SAM FACES ATTACK ON LOVES"

"BARE-FACED LIAR KERR SAYS OF SAM" [Kerr did not testify at the trial].

"DR. SAM ADMITS TWO MORE ROMANCES DURING MARRIAGE"

"WITNESS TELLS OF 'FLIRTATIONS' IN STATE QUIZ"

"Dr. SAM QUIZZED ON OTHER WOMEN"

"STATE'S LAST WORD; 'SAM FAKED BURGLARY TO COVER UP MURDER' "

In addition to the prejudicial effect of the newspaper publicity, petitioner also alleges error due to certain radio publicity. During the trial, counsel for petitioner advised the trial judge that a broadcaster, Robert Considine, announced over the radio a comparison between petitioner and Alger Hiss. Counsel requested the judge to ask the jury if they had heard the broadcast because of its prejudicial effect. The judge refused and stated:

"THE COURT: * * * Well, I don't know, we can't stop people, in any event, listening to it. It is a matter of free speech, and the court can't control everybody.

"MR. MAHON: [an assistant prosecutor] I think that the court has instructed the jury that they are not to read about it or listen to the broadcasts. It was a general instruction that was given at the time the trial started.

"THE COURT: We are not going to harass the jury every morning.

"MR. CORRIGAN: [petitioner's chief trial counsel] I can't help it, Judge. If you don't that's all right with me. I make my exception.

"THE COURT: It is getting to the point where if we do it every morning, we are suspecting the jury. I have confidence in this jury, and we must have confidence or the jury system is of no value whatever to anybody.

"MR. CORRIGAN: The jury are human beings and this situation around here is unprecedented in the history of trials in the United States."

Regarding unfavorable publicity during trial, the Court of Appeals for the Sixth Circuit, in Krogmann v. United States, 225 F.2d 220, 228 (1955) stated:

"Unfavorable publicity to a defendant given in newspapers about a pending jury trial is not necessarily grounds for setting aside a verdict, but under certain circumstances may result in prejudice to a defendant so as to cause a mistrial. Generally, an incorrect, unfavorable report of the evidence presented against a defendant on a material issue, which comes to the attention of a juror or jurors during the pendency of the trial raises a rebuttable presumption that the rights of the defendant have been prejudiced. The District Judge should ascertain

if the report has come to the attention of a juror and if so, take the necessary steps to rebut such presumption, and if not convinced that the presumption has been rebutted, declare a mistrial. * * * "

And in Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959), the Supreme Court reversed a conviction in the Federal District Court where some of the jurors saw and read newspaper articles which were prejudicial to defendant. The Court said, at pages 312–313, 79 S.Ct. at page 1173:

"The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. * * * Generalizations beyond that statement are not profitable, because each case must turn on its special facts. We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. * * * It may indeed be greater for it is then not tempered by protective procedures."

It must be recalled that the jury in this case was not sequestered until the cause was submitted to them after the charge of the court. It is clear beyond doubt, because of the sheer volume of publicity which attended the trial, that the jury read and heard about the case through the news media.[4] In fact, the records shows, at page 5429 of the Bill of Exceptions, that the trial judge asked if any juror had heard a certain broadcast by Walter Winchell and two jurors replied that they had.[5]

4. On this point, see infra, at page 63.

5. In that broadcast, it was reported that a woman, then under arrest for robbery, had stated that "she was the mistress of Sam Sheppard, and that he was re-

sponsible for the birth of a child." Each of the jurors who had heard the broadcast answered "No" to the question: "Would that have any effect upon your judgment?"

This Court holds that there was such a plethora of prejudicial material contained in the newspapers that no admonition or charge of the court could vitiate the effect of the publicity. Further, the trial judge committed error when he failed to question the jury regarding the Robert Considine broadcast. It was incumbent upon the judge to take every precaution to insure that highly prejudicial material did not infect the minds of the jury. Holmes v. United States, 284 F.2d 716 (4 Cir. 1960). It has even been held that where there is highly prejudicial publicity, the judge should carefully examine each juror out of the presence of the others to determine the effect of the articles on those who had read them and whether they had discussed the articles with others, United States v. Accardo, 298 F.2d 133, 136 (7 Cir. 1962).

The Court also notes the manner in which the trial judge allocated the courtroom to members of the news media. It is one thing to accommodate the news media; it is quite different when a major portion of the courtroom is reserved for it. Here a comparatively small courtroom was reserved primarily for the news media and the trial became its showpiece. The Supreme Court of Ohio characterized the atmosphere surrounding the trial as "a 'Roman holiday' for the news media." Under such circumstances, the requisite atmosphere for a fair trial could not, and in fact did not, exist.

Any one of the above mentioned factors, i. e., the insidious, prejudicial newspaper reporting, the refusal of the trial judge to question jurors regarding an alleged prejudicial radio broadcast and the carnival atmosphere which continued throughout the trial, would be sufficient to compel the conclusion that petitioner's constitutional rights were violated. But when they are cumulated, this Court cannot, unless it were to stretch its imagination to a point of fantasy, say the petitioner had a fair trial in view of the publicity during trial.

The Court cannot pass to the next claim of error without pausing to comment further on the manner in which the three Cleveland newspapers reported the murder of Marilyn Sheppard and the subsequent events. It is often difficult to draw the line between propriety and impropriety in newspaper reporting. Newspapers have the right and indeed an obligation to the community to advocate and to criticize. But with respect to the Sheppard case, there can be no doubt as to the impropriety in the manner in which it was reported by the Cleveland newspapers. The inflammatory and prejudicial reporting did not subside when the trial began; it continued throughout the trial. And special note must be given to the attempt of the newspapers to influence the jury. It was startling to find photographs of the entire jury and of individual jurors (at times giving their home addresses) in no less than 40 issues of the Cleveland newspapers. The Court need not be naive, and it does not stretch its imagination to recognize that one of the purposes of photographing the jurors so often was to be assured that they would look for their photographs in the newspapers and thereby expose themselves to the prejudicial reporting. Also, the newspapers ran editorials praising the trial judge (he was a candidate for re-election) and published photographs and sketches of him in at least 46 separate issues. This was certainly an attempt to bring him around to their way of thinking.

If ever there was a trial by newspaper, this is a perfect example. And the most insidious violator was the Cleveland Press. For some reason that paper took upon itself the role of accuser, judge and jury. The journalistic value of its front page editorials, the screaming, slanted headlines and the nonobjective reporting was nil, but they were calculated to inflame and prejudice the public. Such a complete disregard for a sense of propriety results in a grave injustice not only to the individual involved but to the community in general. Public officials, the courts and the jury

are unable to perform their proper functions when the news media run rampant, with no regard for their proper role. Numerous responsible newspapers and magazines noted this abuse of freedom of the press and published editorials [6] which were highly critical of the Cleveland newspapers, especially the Cleveland Press.

Freedom of the press is truly one of the great freedoms which we cherish; but it cannot be permitted to overshadow the rights of an individual to a fair trial. As stated by Mr. Justice Jackson in his concurring opinion in Shepherd v. Florida, 341 U.S. 50, 53, 71 S.Ct. 549, 550, 95 L.Ed. 740 (1951):

> " * * * Newspapers, in the enjoyment of their constitutional rights, may not deprive accused persons of their right to fair trial. * * *"

On this subject, an often quoted opinion is that of Mr. Justice Frankfurter concurring in Pennekamp v. Florida, 328 U.S. 331, 354–356, 66 S.Ct. 1029, 1041–1042, 90 L.Ed. 1295 (1945), wherein he stated:

> "Without a free press there can be no free society. Freedom of the press, however, is not an end in itself but a means to the end of a free society. The scope and nature of the constitutional protection of freedom of speech must be viewed in that light and in that light applied. * * *
>
> "A free press is vital to a democratic society because its freedom gives it power. Power in a democracy implies responsibility in its exercise. No institution in a democracy, either governmental or private, can have absolute power. Nor can the limits of power which enforce responsibility be finally determined by the limited power itself. * * * In plain English, freedom carries with it responsibility even for the press; freedom of the press

is not a freedom from responsibility for its exercise. * * *" [Footnotes omitted.]

By its actions in the Sheppard case, the Cleveland Press showed no respect for its responsibilities. If ever a newspaper did a disservice to its profession; if ever the cause of freedom of the press was set back, this was it. The failure of that newspaper and the two other Cleveland newspapers to adhere to their responsibilities cannot be permitted to deny petitioner his right to a fair trial.

(2) *Did the trial judge, by failing to disqualify himself after making certain statements regarding petitioner's guilt, violate petitioner's constitutional rights?* (issue numbered 23). Counsel for the parties, by agreement, have submitted into evidence the statements of two persons to whom the trial judge, Judge Blythin, made comments regarding the guilt of petitioner. One of the statements was given by Edward T. Murray, a Clerk in the Common Pleas Court of Cuyahoga County. He stated that in July of 1954, he and a lawyer, who is now deceased, were discussing the Sheppard case (three or four other persons were present but Mr. Murray could not recall their names) and Judge Blythin walked in and they discussed the case with him. Mr. Murray stated that as the judge was leaving "he made the remark that Sam Sheppard was as guilty as he [the judge] was innocent."

The second statement is that of Miss Dorothy Kilgallen, a well-known journalist. She stated that on, what was to the best of her recollection, the first day of trial, someone told her that Judge Blythin would like to see her in chambers. The following is Miss Kilgallen's statement regarding her conversation with the judge:

> "He was very affable. He shook hands with me and said, 'I am very glad to see you, Miss Kilgallen. I watch you on television very frequently and enjoy the program.'

---

6. These editorials are reproduced in the Appendix to the petition for writ of certiorari and are part of the evidence in this case, see supra, page 44.

And he said, 'But what brings you to Cleveland?'

"And I said, 'Well, your Honor, this trial.'

"And he said, 'But why come all the way from New York to Cleveland to cover this trial?'

"And I said, 'Well, it has all the ingredients of what in newspaper business we call a good murder. It has a very attractive victim, who was pregnant, and the accused is a very important member of the community, respectable, very attractive man.'

"And I said, 'Then added to that, you have the fact that it is a mystery as to who did it.'

"And Judge Blythin said, 'Mystery? It's an open and shut case.'

And I said, 'Well, what do you mean, Judge Blythin?' I was a little taken aback because usually, I have talked to many judges in their chambers, but usually they don't give me an opinion on a case before it's over.

"And so I said, 'What do you mean Judge Blythin?'

"And he said, 'Well, he is guilty as hell. There is no question about it.'

"And after that we talked about the accommodations. He, I believe, again expressed his astonishment that people like Bob Considine and people from foreign newspapers were on hand. Theo Wilson was there from the News with another man from the News, whose name I don't recall, Hank something or other.

"And the Judge seemed genuinely surprised that there was so much interest in this particular case, which to him seemed to be a mere formality."

It is unquestionable that if trial counsel for petitioner had learned of these statements prior to trial he would have filed an affidavit of prejudice against the judge. In State ex rel. Pratt v. Weygandt, Chief Judge, 164 Ohio St. 463, 132 N.E.2d 191 (1956) the Supreme Court of Ohio stated in the fourth paragraph of its syllabus:

"The term, 'biased or prejudiced,' when used in reference to a judge before whom a cause is pending implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts."

It is indeed axiomatic that the right to a fair trial as guaranteed by the Federal Constitution includes an impartial judge, Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927), and though it may be presumed that judges are impartial, the presumption may certainly be destroyed.

The question before this Court is whether the remarks of Judge Blythin that "Sam Sheppard is as guilty as he [the judge] was innocent" and "Well, he [Sheppard] is as guilty as hell. There is no question about it" removed the presumption that the trial judge was impartial and in fact raised the presumption that he was prejudiced against petitioner.

It is not the purpose of this Court to condemn a man who has passed away and is unable to come to his own defense; however, the foregoing statements are part of the uncontroverted evidence in this case and must be accepted as being true. It must be recognized that judges are human and often hold some opinion as to the guilt or innocence of the person being tried before them. However, a judge must have no interest other than the pursuit of justice and when he expresses in emphatic terms the opinion that the person before him is guilty, as was done here, the judge then has a personal interest in seeing that the defendant is convicted or the judge may

well be embarrassed for having made such an emphatic statement of guilt.

In In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) the Supreme Court said:

"A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that 'Every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law.' * * * Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way 'justice must satisfy the appearance of justice.' * * * * "

Having reviewed the stipulated facts and the applicable law, this Court can come to no conclusion but that the presumption of the trial judge's impartiality was removed and in its place there arose a presumption that he was prejudiced against petitioner. This is not to say that the trial judge did not attempt to give petitioner a fair trial, but,

once he made emphatic statements of petitioner's guilt, one can no longer assume that he was impartial or that he was then able to exercise "sound discretion."

This being true, and because the trial judge is often required to exercise his sound discretion during trial, the Court of Appeals of Cuyahoga County and the Supreme Court of Ohio in affirming the conviction repeatedly stated that certain matters were within the sound discretion of the trial judge, the Court finds that the trial judge should have disqualified himself and by failing to do so he violated petitioner's constitutional rights.[7]

(3) *Did the trial judge, in permitting police officers to testify that petitioner had refused a lie detector test (issue numbered 15) and in permitting a witness named Houk to testify that he had taken a lie detector test (issue numbered 16), violate petitioner's constitutional rights?*

With respect to the question in issue numbered 15, the parties have stipulated as follows:

"Detective Robert Schottke, a detective from the Cleveland Police Department, testified as a witness for the State in its case-in-chief. He recounted a conversation held between himself and the petitioner at the Bay View Hospital on July 4, 1954, at about 3:00 P.M. (the day of the murder). Schottke stated that he at one point said to petitioner 'I think you killed your wife' to which petitioner responded 'Don't be ridiculous!' Schottke testified that he then asked petitioner if he would submit to a lie-detector test. Petitioner inquired how a lie detector worked, and was told that it in-

---

7. There was also submitted into evidence the statement of Fred W. Garmone, one of petitioner's trial counsel. That statement shows that Judge Blythin's son was a member of the Homicide Unit which investigated the murder of Marilyn Sheppard. When this matter was discussed in chambers with trial counsel, the judge stated that he would disqualify himself if counsel wished him to do so. Mr. Cor-

rigan, chief trial counsel, and Mr. Petersilge, also a trial counsel, decided that the trial should go forward and did not request that the judge disqualify himself. Though this Court makes no ruling on this point, it is arguable that the judge, even without the request of counsel, under the circumstances, should have disqualified himself.

volved certain measurements of reactions in the blood pressure, respiratory and sweat gland systems. Petitioner then, according to Schottke, complained that due to his injured condition the test would not be a fair one, and Schottke told him that he could take it later when he felt better. (Tr. 3590–91).

"Carl Rossbach, of the Cuyahoga County Sheriff's office, testified for the State during its case-in-chief. He stated that he and two other law enforcement officers questioned petitioner at the Bay View Hospital on July 8, 1954, in the afternoon. Rossbach recited the following conversation:

" 'I told him that he was the only suspect we had, and that in order to eliminate himself he should cooperate with us and take a lie detector test. To this he objected, stating that he was too emotionally upset and that he didn't think he could do justice with that test because he was too upset. I then asked him at least 10 or 15 more times at various times to take the test, and he said "I won't take it because my attorney has advised me not to and members of my family have asked me not to." ' '

Rossbach stated that he had made this request of Sam Sheppard twice during the conversation of July 8th. (Tr. 3846). He then testified that he saw petitioner again on July 12th, and renewed his request, asking that petitioner meet with him privately and submit to a test 'unbeknownst to anyone but yourself and myself.' At this point, for the first time, the defense objected on the ground that since the results of lie-detector tests were inadmissible in Ohio, the refusal to submit should be inadmissible. The Court ruled that the witness had already answered the question before him, and stated 'The Court will instruct the jury on the matter.' Rossbach was

then asked by the prosecutor what petitioner's answer to this request for a secret test had been (following defense exception) and replied that petitioner had said 'No, I'll be guided by the advice of my family and attorneys.' The Court then stated:

" 'Ladies and gentlemen of the jury, you are not to understand by these questions that any person is obligated to take any lie detector test. A person has his own choice. He is under no obligation whatever to take it.'

"Defense counsel then asked the Court to instruct the jury that the results of such a test would be inadmissible in any case, and the Court replied 'Well, they are not here, anyway, Mr. Petersilge * * we need not go beyond what we have in evidence. The evidence is here that he was asked to take it, he refused. Now, the Court tells the jury he doesn't have to take it, period. We will stop right there.' (Tr. 3853) Witness Rossbach then repeated petitioner's refusal to submit.

"The petitioner, on direct examination in the defense case, testified that he had been asked to take such a test, that he was told (by Officers Schottke and Gareau) that such tests were 'infallible,' to which petitioner responded that he did not understand that they were infallible, but if they were he would submit. (Tr. 6298–99) There was no mention in the Court's charge to the jury of the lie-detector evidence."

With respect to the question in issue numbered 16, the parties have stipulated that

"J. Spencer Houk, petitioner's neighbor and the mayor of Bay Village, testified for the State in its case-in-chief. He was the person whom petitioner had called to report the murder, and Houk and his wife were the first upon the scene (other than petitioner). Houk testified to

many observations and conversations; some of his evidence conflicted with that offered by the defense. He testified (on direct examination) that in one way and another members of the Sheppard family had suggested that he, Houk, was implicated in the murder, and that on one occasion Stephen Sheppard, petitioner's older brother had, in the presence of Detective McArthur at the Cleveland Police Station, made certain direct charges against him. The prosecutor then asked:

> " 'Did you, Mr. Houk, submit to lie detector tests?' The defense objected, and the Court ruled that the witness might answer yes or no but could not go 'beyond that.' Houk answered in the affirmative, and the defense excepted. (Tr. 2834)."

The petitioner, in his appeals to the Court of Appeals of Cuyahoga County and the Supreme Court of Ohio, did not allege error because of the introduction of testimony regarding his refusal to take a lie detector test (issue numbered 15) but did allege error in the introduction of testimony that Mayor Houk had taken such a test (issue numbered 16). This Court has held that it has jurisdiction to consider each of these alleged errors even though the former was not urged on appeal to the Ohio Courts, supra, at pages 42 and 43. With regard to the latter alleged error, the Supreme Court of Ohio made no statement in its opinion; however, the Court of Appeals stated as follows:

> "The defendant also claims error in permitting Mayor Houk to testify to submitting to a lie detector (polygraph) test. The record shows that Dr. Stephen Sheppard at one point in the investigation, indicated that Mayor Houk was in some way involved. After this was brought out the Mayor was asked, 'Did you, Mr. Houk, submit to a lie detector test?' To which he answered over defendant's objection, 'Yes.' The results of the test were not inquired

about, and the simple fact that a test was made by agreement of the witness under the circumstances could not prejudice the defendant's case." Ohio v. Sheppard, 100 Ohio App. 345, 388, 128 N.E.2d 471, 498 (1955).

■ The courts in this country have uniformly held, since the question was first considered in Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923), that the results of lie detector tests are inadmissible because the tests lack sufficient reliability to justify the admission of expert testimony based upon those results. Going one step further, as to the question of whether a defendant is prejudiced by testimony that he refused to submit to such a test, an Ohio Appellate Court, in Ohio v. Smith, 113 Ohio App. 461, 464, 178 N.E.2d 605, 608 (Court of Appeals for Lucas County 1960), stated:

> " * * * decisions in other jurisdictions generally hold that since evidence of the result of a lie detector test is inadmissible in a criminal case, evidence of suspect's willingness or unwillingness to take such a test is also inadmissible. * * *
>
> "It is therefore concluded that the admission of the testimony in the instant case was erroneous * * *."

Some courts hold that the prejudicial character of the error in mentioning the fact that a lie detector test was or was not taken is so gross that it cannot be cured; others hold that the error can be cured by striking and proper instructions from the trial judge. See cases cited in Ohio v. Smith, supra.

Now, with respect to the testimony of police officers Schottke and Rossbach, it may be that it was prejudicial error for the trial judge to allow these witnesses, even though there was no objection by defense counsel until after Rossbach had testified, to testify repeatedly that petitioner had refused to take a lie detector test. Cases such as New Jersey v. Driver, 38 N.J. 255, 183 A.2d 655 (1962),

and cases cited therein, would reach such a conclusion. In that case, the prosecutor in his opening statement alluded to the fact that defendant had refused to submit to a lie detector test. The appellate court reversed even though counsel for defendant had taken no objection to the remark.

The Court stated, 183 A.2d at page 658:

"If the results of polygraph examinations are not competent evidence, *a fortiori*, refusal by a defendant in a criminal case to submit to one cannot be made the subject of testimony. In terms of degree of prejudice, the average jury, unfamiliar with the present scientific uncertainty of the tests, might very well be even more affected by proof of a defendant's refusal to take the test than by the evidence of results adverse to him coupled with proof of its scientific imperfection. A refusal might be regarded as indicating a consciousness of guilt—undoubtedly the reason here why the Assistant Prosecutor placed such emphasis upon it in his opening. Moreover, his remarks were calculated to prejudice the jury by implying that the mechanical device was the ultimate in tests for the truth."

And the Court concluded, 183 A.2d at page 659:

" * * * we regard the remarks in the opening [statement] concerning the lie detector tests as possessing such horrendous capacity for prejudice against the defendant as to constitute plain error. * * * "

■ But this Court need not adopt that stringent a rule (though the Court does not mean to imply that it is not the better rule) because even if the error could have been cured, the trial judge failed to do so. After objection was made by defense counsel, the judge stated: "The Court will instruct the jury on the matter." The Court then told the jury that petitioner was under no obligation to take such a test. That instruction was clearly not sufficient to cure the error, even if it were curable. The error is a serious one and, especially since the newspapers had repeatedly reported petitioner's failure to take a lie detector test, the trial judge, at a minimum, had the duty of instructing the jury that no inference could be drawn from petitioner's refusal to submit to such a test. By failing to do so he violated petitioner's constitutional rights. Of course, as previously noted, this is not to say that such an instruction would have cured the error, but since the instruction was not given the Court need not decide what its effect would have been.

The Court has only a brief comment to make regarding the allegation of error in allowing witness Houk to testify that he had taken a lie detector test (issue numbered 16). Though the witness testified that members of petitioner's family had implicated him in the murder, he was not on trial and by allowing him to testify that he had taken such a test the jury was permitted to infer that he had passed it. This merely brought once more to their attention the fact that someone took a lie detector test and since he was called by the state he probably had passed it. If this had been the only error in this case, it may be that it would not, in and of itself, be reversible error, but it clearly compounds the error already noted by the admission of the testimony of Schottke and Rossbach.

(4) *Did the action of the bailiffs in permitting the jurors, during deliberations and without authority from the Court, to hold telephone conversations with persons outside the jury room, violate petitioner's constitutional rights?* (issue numbered 10).

With respect to this issue, the parties have stipulated as follows:

"After arguments and charge were complete, the jury was directed to retire to deliberate its verdict. They were placed in charge of two bailiffs, Edgar Francis and Simon Steenstra. The deliberations lasted

for more than four days, during which time the jury was kept (except when at court deliberating) in the Carter Hotel in downtown Cleveland. They, together with the bailiffs, occupied the entire seventh floor of the hotel. Bailiff Steenstra had made arrangements whereby the telephones in the rooms occupied by the jurors were disconnected so that no calls could be placed or received.

"The record does not indicate the times, the number of calls, or the identity of the juror-callers, but it is clear that both Steenstra and Francis permitted jurors to place outside calls from their (the bailiffs') rooms between the time the jury took the case (December 17, 1954) and the time the verdict was rendered (December 21, 1954). The calls were placed by the jurors. No records were kept as to the numbers called, the parties called, talked with, or the calling jurors. The bailiffs sat next to the phone as the conversations took place, but could only hear that half of the conversation made by the juror; what was said to the jurors could not be heard by the bailiffs. The Court was never asked for permission to allow the jurors to make these calls, and no permission was ever given. (Tr. 7083–86)"

In its opinion, the Supreme Court of Ohio, regarding this matter, stated:

"Defendant contends that he was prejudiced in this case by the actions of two officers of the court, in whose charge the jury was committed during its deliberations, in permitting some members of the jury to make unmonitored telephone calls in violation of Section 2945.33, Revised Code, which reads as follows:

" 'When a cause is finally submitted the jurors must be kept together in a convenient place under the charge of an officer until they agree upon a verdict, or are discharged by the court. The court may permit the jurors to separate during the adjournment of court overnight, under proper cautions, or under supervision of an officer. Such officer shall not permit a communication to be made to them, nor make any himself except to ask if they have agreed upon a verdict, unless he does so by order of the court. * * *'

"It is conceded that no authorization for such telephone calls was given by the court. * * *"

The Court noted that counsel for defendant relied upon Ohio v. Adams, 141 Ohio St. 423, 48 N.E.2d 861, 146 A.L.R. 509 (1943) wherein the third paragraph of the syllabus reads:

"The violation by a court officer in charge of a jury of Section 13448–1, General Code [Section 2945.33, Revised Code], to the effect that he shall not communicate with a jury in his charge or custody except to inquire whether it has reached a verdict, will be presumed to be prejudicial to a defendant against whom, after such communication, a verdict is returned by such jury."

The Court distinguished the Adams case because in that case the court bailiff, on being informed by the jury during its deliberations that it could not agree, stated to it: "You can't do that. You must reach a decision if you have to stay here for three months."

The Court then distinguished the case of Emmert v. Ohio, 127 Ohio St. 235, 187 N.E. 862, 90 A.L.R. 242 (1933) wherein the officer in charge of the jury had made remarks to certain jurors such as:

" * * * 'My God, you are all wet. Judge Stahl expects you to return a verdict of guilty and if you don't it will be just too bad,' * * *."

The Court continued, saying:

"In situations such as those in the Adams and Emmert cases, it is easy to presume prejudice to the defendant as a result of the conduct of the bailiff. Can the same be said of the conduct of the bailiffs here in permitting jurors, who for several days and nights had been sequester-

ed and unable to see or hear from their husbands, wives or children, to telephone those members of their families? We do not think so. There is, on the contrary, every reason to believe that assurances of the health and welfare of their loved ones would tend to ease the jurors' minds as to personal matters and would make them better, more conscientious jurors. \* \* \*

"The law of Ohio is that no judgment of conviction shall be reversed in any court for any cause unless it appears affirmatively from the record that the defendant was prejudiced thereby or was prevented from having a fair trial. Section 2945.83, Revised Code. There is no such affirmative showing of prejudice here, and this court will not presume a prejudice as a matter of law from the fact that some of the jurors made telephone calls to members of their immediate families." Ohio v. Sheppard, supra, 165 Ohio St. at pages 297–299, 135 N.E.2d at page 345.

▪▪▪▪ This Court believes that the Ohio Supreme Court should have granted a new trial because of the unequivocal language of Section 2945.33, Ohio Revised Code that

"Such officer shall not permit a communication to be made to them, [the jurors] nor make any himself except to ask if they have agreed upon a verdict, unless he does so by order of the court"

and the rationale implicit in the third paragraph of the syllabus of the Adams case, i. e., the violation of this stated duty by the court officer will be presumed to be prejudicial to the defendant. However, it is not upon this basis that the Court finds error because the foregoing is a determination by the Ohio Supreme Court on a question of Ohio law. This Court finds prejudicial error because the right to a fair and impartial trial as guaranteed by the due process clause of the Fourteenth Amendment includes the

right to have a jury which is not permitted, after it begins its deliberations, to have unmonitored telephone conversations with third persons. As stated quite simply in Mattox v. United States, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L. Ed. 917 (1892):

"Private communications, *possibly* prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least until their harmlessness is made to appear." [Emphasis added].

There is nothing in the record to show the harmlessness of that part of the telephone conversations which the bailiffs could not hear. Accordingly, petitioner's constitutional rights were violated.

## CONCLUSION

Once again, the Court repeats what was stated at the beginning of this decision, and that is that the guilt or innocence of petitioner was not before the Court. The Court has considered the question of whether or not petitioner received a fair trial and in regard to that question has found five separate violations of petitioner's constitutional rights, i. e., failure to grant a change of venue or a continuance in view of the newspaper publicity before trial; inability of maintaining impartial jurors because of the publicity during trial; failure of the trial judge to disqualify himself although there was uncertainty as to his impartiality; improper introduction of lie detector test testimony and unauthorized communications to the jury during their deliberations. Each of the aforementioned errors is by itself sufficient to require a determination that petitioner was not afforded a fair trial as required by the due process clause of the Fourteenth Amendment. And when these errors are cumulated, the trial can only be viewed as a mockery of justice. For this reason, it is not necessary to consider the remainder of the 23 stipulated issues, which range from having significant merit to no merit at all.

This Court is well aware of the fact that many State Court judges have affirmed petitioner's conviction on appeal (two judges of the Supreme Court of Ohio dissented), but after reviewing the evidence submitted, the Court has no hesitancy in reaching the conclusions already noted. It should, however, be noted that petitioner's federal constitutional rights were not considered by those Courts, at least there is no mention of such consideration in their decisions; and the United States Supreme Court did not consider those rights since it denied the petition for writ of certiorari. So that there could be no misunderstanding as to the meaning of such a denial, Mr. Justice Frankfurter, in a memorandum stated:

"Such a denial of his petition in no wise implies that this Court approves the decision of the Supreme Court of Ohio. It means and means only that for one reason or another this case did not commend itself to at least four members of the Court as falling within those considerations which should lead this Court to exercise its discretion in reviewing a lower court's decision. * * *" Sheppard v. Ohio, 352 U.S. 910, 911, 77 S.Ct. 118, 119, 1 L.Ed.2d 119 (1956).

The order which follows is somewhat atypical in that it permits petitioner's immediate release, but this case is unusual, for petitioner has been incarcerated for almost ten years as a result of a trial which fell far below the minimum requirements of due process.

## ORDER

In accordance with the foregoing decision, which shall constitute the findings of fact and conclusions of law in this proceeding, the Court having found that petitioner was denied his constitutional right to a fair trial, it is concluded that the judgment and sentence in pursuance to which respondent holds petitioner in custody is void.

Therefore, the respondent, E. L. Maxwell, Warden, shall release petitioner upon the filing of a bond in the sum of $10,000.00 Said bond shall be conditioned upon petitioner's appearance before the Common Pleas Court of Cuyahoga County, should such an order be issued; he shall also remain subject to further order of this Court.

Should no further action be taken by the State of Ohio or the County of Cuyahoga within 60 days after the filing of this decision, petitioner's release shall be final and unconditional and the bond cancelled.

It is so ordered.