**Joseph CORBETT, Jr., Petitioner,**

v.

**Wayne K. PATTERSON, Warden of the Colorado State Penitentiary, Respondent.**

**Civ. A. 67–C–25.**

United States District Court
D. Colorado.

July 3, 1967.

William H. Erickson, Denver, Colo., and H. Malcolm Mackay, Denver, Colo., for petitioner.

Duke W. Dunbar, Atty. Gen., by John P. Moore and Paul D. Rubner, Asst. Attys. Gen., Denver, Colo., for respondent.

## MEMORANDUM OPINION AND ORDER

ARRAJ, Chief Judge.

This matter is before the Court on a petition for a writ of habeas corpus. The petitioner was convicted in 1960 of first-degree murder and was sentenced to life imprisonment. The victim of the murder was Adolph Coors III, a prominent Colorado businessman. Petitioner's conviction was affirmed by the Colorado Supreme Court, Corbett v. People, 153 Colo. 457, 387 P.2d 409 (1963); his petition for rehearing was denied, 154 Colo. 238, 389 P.2d 853 (1963); and the United States Supreme Court denied certiorari, Corbett v. Colorado, 377 U.S. 939, 84 S. Ct. 1346, 12 L.Ed.2d 302 (1964). Respondent has conceded that petitioner has exhausted his available state remedies, as required by Title 28 U.S.C. § 2254, with respect to all of the issues in the petition except one, which will be discussed later in this opinion.

Although the petition is quite lengthy and its allegations legion, we believe that the basic grounds for relief can be summarized as follows:

1) Petitioner was deprived of due process of law and of his right to effective counsel by the trial court's denial of bail; 2) Various rulings by the trial court and actions of the prosecuting authorities effected a deprivation of petitioner's right to effective counsel; 3) The prejudicial publicity and conduct of the press created an envenomed atmosphere in which petitioner was unable to receive a fair trial consonant with due process of law; and 4) Petitioner was deprived of due process of law by the trial court's failure to declare a mistrial when prejudicial incidents occurred during the trial.

-I-

We shall first examine the claim that the trial court's denial of bail constituted an encroachment upon petitioner's constitutional rights. It is generally said that the denial of bail is not an available basis for seeking post-conviction relief, see, e. g., Midgett v. Warden, 217 F.Supp. 843, 846 (D.Md.1963). However, since petitioner claims that the denial deprived him of the assistance of counsel and of a fair trial, we shall examine the merits of his assertion.

It is definitely beyond cavil that the right to bail is not absolute.

Neither the Eighth Amendment nor the Fourteenth Amendment requires that everyone charged with a state offense must be given his liberty on bail pending trial. * * * Traditionally and acceptedly, there are offenses of a nature as to which a state properly may refuse to make provision for a right to bail. Mastrian v. Hedman, 326 F.2d 708, 710 (8th Cir. 1964), cert. denied, 376 U.S. 965, 84 S.Ct. 1128, 11 L.Ed. 982.

Certainly first-degree murder, with which petitioner was charged, is such an offense.

Factors which should be considered by a trial court in determining whether bail should be set, and the amount of such bail, include the seriousness of the offense, the possible danger to the community, the penalty, the character and reputation of the accused and the probability of his appearing. See, e. g., Jones v. Grimes, 219 Ga. 585, 134 S.E. 2d 790 (1964). We note that petitioner was charged with first-degree murder, punishable by death, and that he had previously been convicted of second-degree murder and had escaped. Applying these facts to the relevant standards, it is obvious that the bail denial cannot be viewed as unreasonable or arbitrary, or

as an infringement upon petitioner's constitutional rights.

■ In support of his claim petitioner has pointed to Colo.Rev.Stat.Ann. § 40-2-3 (1953), which provides that the death penalty cannot be imposed on the basis of only circumstantial evidence. He claims that once the prosecution conceded that they probably did not have the direct evidence necessary to seek the death penalty, then at that point petitioner ceased to be charged with a "capital" offense and was entitled to bail as a matter of right. We do not agree. The *offense* with which he was charged was still a capital one, even if it should later develop that the type of evidence adduced did not support a verdict imposing the death penalty.

■ Petitioner has also focused on the provision in the Colorado Constitution, Art. II, § 19, which states that "all persons shall be bailable by sufficient sureties except for capital offenses, when the proof is evident or the presumption great." Petitioner apparently urges that bail was required because the proof against him was not evident. This requirement simply goes to the proof of *guilt*, not to the kind of proof needed for the imposition of the death penalty. Even though the State's evidence was all circumstantial in nature, there was a considerable amount of it—clearly enough to constitute "evident proof" within the meaning of the Colorado Constitution. Of course a violation of the state constitution would not of itself be a proper ground for relief in this Court in any case.

■ Having concluded that the bail denial itself was not constitutionally improper, we need not examine those circumstances which petitioner alleges *resulted* from the bail denial and deprived him of his right to a fair trial and effective assistance of counsel.

-II-

The second broad ground for relief urged by petitioner is that he was deprived of his right to the effective assistance of counsel, in contravention of the Sixth and Fourteenth Amendments. Numerous incidents are complained of as having contributed to the alleged deprivation, and we shall attempt to analyze each. The breakdown and phrasing of these grounds are essentially our own.

A) Following his arrest petitioner received no preliminary hearing, was held incommunicado for two weeks without the appointment of counsel and was subjected to repeated interrogation.

■ Our initial observation is that a state criminal defendant has no federal constitutional right to be afforded a preliminary hearing. Goldsby v. United States, 160 U.S. 70, 73, 16 S.Ct. 216, 40 L.Ed. 343 (1895); Pearce v. Cox, 354 F.2d 884, 891 (10th Cir. 1965); Green v. Bomar, 329 F.2d 796 (6th Cir. 1964).

■ As to the alleged fact that petitioner was held incommunicado and interrogated without the appointment of counsel, we note the inapplicability of the United States Supreme Court decisions in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 100 A.L.R.3d 974 (1966). The rules enunciated in those opinions are *not* to be given retrospective application. Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

Moreover, these cases, as well as the prior decisions in this area, were concerned with the situation where an accused who was not afforded counsel made a formal confession or some other incriminatory statements. The denial of counsel would preclude the later admission of the statements at trial, and in that sense operate only as an exclusionary evidence rule.

■ We do not feel that the absence of counsel during pretrial interrogation in and of itself deprives an accused of due process of law where, as in the present case, the interrogation yields no incriminatory statements or even remarks leading the prosecution to the dis-

covery of evidence. At least there has been no claim to this effect. Thus, the mere fact that petitioner was interrogated prior to the appointment of counsel does not amount to a constitutional defect in the proceedings.

B) Following the appointment of counsel petitioner was again interrogated, without the presence of his counsel and against the order of the trial court that such interrogation was to cease.

■ The solely prospective application of the Escobedo-Miranda rules and the fact that the interrogation bore no fruit constitute complete answers to this contention as well. We might also note that the order of the trial court that defendant was not to be interrogated was apparently not broad enough to include the particular person who did the questioning. This was a fact which the trial judge himself recognized.

■ C) The trial court denied petitioner discovery rights as to F.B.I. investigative reports, and various documents and physical evidentiary items in the possession of the State.

■ Traditionally the principle of discovery has been a virtual stranger to the criminal law. In recent years, however, it has been recognized by decision, rule and statute that a defendant is entitled to some limited discovery to enable him to prepare a meaningful defense. Thus, in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) it was held that a defendant has a right to inspect written statements of a witness for the purpose of impeachment *after* the witness has been called to testify at trial. In Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giles v. State of Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 731 (1967), it was held that a defendant is entitled to inspect suppressed evidence favorable to his case. And in Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966), the defendant was held entitled to inspect the grand jury minutes. Discovery rights have also been conferred by the Jencks Act, Title 18 U.S.C. § 3500, and by Fed.

R.Crim.P. 16. These latter provisions are not, however, of constitutional origin, and they represent exceptions to the general rule concerning discovery.

The discovery claims raised by petitioner do not fall within any of the exceptions recognized by the Supreme Court as being necessary components of the right to due process of law. For example, it has not been shown, or even seriously urged, that in petitioner's case there was evidence suppressed which would have been favorable to his defense, so the *Brady* and *Giles* rulings are not apposite.

■ We can understand why the materials which are discoverable under the *Jencks, Dennis* and *Brady* decisions are considered necessary for a fair trial, but this is not to say that the prosecution must, as a matter of constitutional compulsion, turn over virtually its entire file, as well as all of its evidentiary items. Petitioner asserts in this respect that a constitutional violation occurred when the trial court quashed the subpoena duces tecum which was served upon F.B.I. Agent Scott Werner. That subpoena was exceedingly broad and was aptly described by the Colorado Supreme Court as a "fishing expedition." Its quashing was perfectly in conformity with the requirements of due process of law.

■ We might note that if there were a broad constitutional right to inspect F.B.I. reports in advance of trial, at least a portion of the Jencks Act, supra, would be unconstitutional, Title 18 U.S.C. § 3500(a) provides that:

In any criminal prosecution brought by the United States, no statement or report in the possession of the United states which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

We also note that petitioner did not call Agent Werner (or indeed any wit-

ness) at trial in an attempt to discover the nature of those items which he earlier sought by subpoena duces tecum; this fact would cast some doubt upon any claim that the items would have been favorable to petitioner.

D) The trial court denied petitioner's motions for the appointment of expert witnesses to rebut the prosecution's witnesses, and for the allowance of expenses to examine the prosecution's out of state witnesses.

■ Although laudable legislative provisions have been made in recent years for the appointment of expert witnesses for indigent defendants, see, e. g., the Criminal Justice Act of 1964, Title 18 U.S.C. § 3006A(e), in the absence of legislation such appointments rest solely in the discretion of a trial court.

The attempt to place this claim in a constitutional posture has previously been made before the Court of Appeals of the Tenth Circuit, which made the following observation:

> Appellant concedes that he has found no cases directly holding that the appointment of experts is a constitutional requisite; nor has our search revealed any such cases. * * * 'Fundamental fairness' is the test of due process, Silva v. Cox, 10th Cir., 351 F.2d 61, and we see nothing so unfair here as to raise a federal constitutional issue. Watson v. Patterson, 358 F.2d 297, 298 (10th Cir. 1966).

■ Applying the fundamental fairness test, we conclude that petitioner's constitutional rights were not breached in this regard.

■ Similarly, there is no broad constitutional right to have one's counsel paid for his out of state examination of witnesses. See United States v. Bowe, 360 F.2d 1 (2d Cir. 1966). The exceedingly large number of out of state witnesses endorsed by the prosecution in petitioner's case would certainly have made such an expense allowance prohibitive. Petitioner "has failed to show that the trial court's action deprived him of the effective assistance of counsel and, thus,

the denial of the motion cannot be considered" a constitutional deprivation. United States v. Bowe, supra at p. 13.

■ E) The district attorney and sheriff's officers instructed the prosecution witnesses not to communicate with petitioner's counsel.

This claim can be disposed of summarily, simply by noting that it is not supported by the record. At the most, the record indicates that the district attorney told his witnesses that they did not *have* to speak to anyone. This was a true representation by the district attorney and did not foreclose petitioner's counsel from interviewing the State's witnesses. The district attorney's statement to the witnesses in this case is clearly distinguishable from the admonition of the prosecutor in Gregory v. United States, 369 F.2d 185 (D.C.Cir. 1966), to the effect that the witnesses were *not* to talk to anyone unless he was present. Petitioner's assertion is without merit.

■ F) The trial court repeatedly allowed the district attorney to endorse witnesses late, denied petitioner's motion for a bill of particulars giving the names of all witnesses known to him, and denied petitioner's motion for continuance based upon the late endorsement.

These assertions are adequately answered by the following quotation from Cordova v. United States, 303 F.2d 454, 455 (10th Cir. 1962):

> There is no * * * constitutional requirement that the prosecution endorse the names of the government's witnesses on the information or indictment, or even disclose them to the defense.

See also, Barnes v. United States, 347 F. 2d 925 (8th Cir. 1965); Bohn v. United States, 260 F.2d 773 (8th Cir. 1958), cert. denied, 358 U.S. 931, 79 S.Ct. 320, 3 L.Ed.2d 304.

■ The allowance of late endorsement of witnesses, as well as the granting of a bill of particulars or a continuance are all discretionary matters. It is noteworthy that when the

district attorney sought late endorsement he represented that the witnesses were unknown to him until the time of the request; this is indicative of the good faith of the requests.

We conclude that none of these claims by itself, nor indeed the aggregate of all of them, demonstrates that petitioner was denied the effective assistance of counsel. The actual representation which petitioner received was of the very highest caliber; his attorneys were devoted and thorough, and of course the present comprehensive petition reveals that their efforts are unflagging.

-III-

As to the next general issue presented in the petition, respondent contends that petitioner has not exhausted his available state remedies, as required by Title 28 U.S.C. § 2254. The issue concerned, as it was phrased by *respondent*, is whether petitioner was "denied a fair trial by virtue of the pre-trial publicity and the atmosphere in which the trial took place."

We are fully mindful of the doctrine of exhaustion in general and of the Tenth Circuit Court of Appeals decision in Watson v. Patterson, 358 F.2d 297 (10th Cir. 1966) in particular. The *Watson* opinion held that where a few of a multitude of issues have not been presented to the state courts, the federal district court should not consider those issues. We do not feel that *Watson* is apposite here, however, for we conclude that *all* of the issues in the petition, including this one, have been considered in the state courts.

Respondent has taken the position that the issue of the state trial court's refusal to grant a continuance or change of venue (an issue upon which remedies have admittedly been exhausted) is different from and wholly independent of the issue of pre-trial publicity and envenomed trial atmosphere. We are unable to agree with this contention. The issues were inextricably bound to one another when the case was presented to the Colorado Supreme Court. It was there urged that the trial court's refusal to grant a change of venue or continu-

ance deprived petitioner of due process of law *because* the pre-trial publicity and the prominence of the victim had created an envenomed atmosphere in Jefferson County, preventing petitioner from receiving a fair and impartial trial.

The fact that the Colorado Supreme Court had before it the "fair trial—free press" issue is apparent from the discussion of the petitioner in his brief in the Colorado Supreme Court, as well as the cases cited and the exhibits referred to in that brief. The cited cases included: Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); Stroble v. State of California, 343 U.S. 181, 72 S. Ct. 599, 96 L.Ed. 872 (1952); Fouquette v. Bernard, 198 F.2d 96 (9th Cir. 1952); and United States ex rel. Sheffield v. Waller, 126 F.Supp. 537 (D.La.1954). (It must be noted that in Colorado errors urged on appeal are set forth in the *briefs* rather than by an assignment of errors as such. See Colo.R.Crim.P. 39(c), and Colo.R.Civ.P. 111(f).

It is true that the Colorado Supreme Court has not considered petitioner's case in the light of Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed. 2d 600 (1966), nevertheless the *issue* was before the Colorado court. We do not feel that a petitioner must renew his claim in the state court each time there is a new Supreme Court pronouncement which relates to his claim. Having fully presented the issue, he has exhausted his available state remedies and can seek relief in the federal district court.

This issue, which we might as a shorthand designation label the "fair trial—free press" issue, is clearly the most substantial and difficult one invoked by the petitioner. Simply stated, our problem is one of determining whether the activities of the press media prevented petitioner from receiving a fair hearing by an impartial jury in a judicially calm atmosphere.

A breakdown of the complained of press activities night be helpful. The kidnaping of Adolph Coors III and the

search for and arrest of petitioner, Joseph Corbett, were naturally major news items both locally and nationally. During the time petitioner was being hunted, the newspapers carried articles revealing him to be a convicted murderer who had escaped from an institution in California.

On September 22, 1960, the Denver Post carried an article entitled "FBI's Detailed Report on Kidnap-Murder of Ad Coors", in which the background of the case and the evidence which had been garnered were summarized. The detailed evidence which was recounted in the article definitely tended to link petitioner to the kidnaping. The expected proof described included automobile identification, a tie-up between the ransom note and a typewriter purportedly purchased by petitioner, the purchase by petitioner of leg irons and handcuffs, and testimony of a witness to the effect that petitioner had been planning "a big score." The article also contained an outline of petitioner's life history, including the fact that he had pleaded guilty and been sentenced to prison in California in 1951 for the crime of second-degree murder, and that he had escaped in 1955. Some of the claimed evidentiary items described in the article were not offered at trial. This article was by far the most detailed and prejudicial release by the news media.

Subsequent articles dealt with the search for the petitioner and his capture on October 29, 1960. Articles in November 1960, which were generally in the inner pages of the newspapers, mentioned the fact that petitioner had failed to comment about the Coors abduction and slaying.

On November 16, 1960 the Denver Post carried a front page story disclosing the identity of a witness who had purportedly seen a man resembling petitioner at the dump where the remains of Adolph Coors III had been found. This witness was not called to testify at the trial.

On November 20, 1960 the Denver Post had a feature story on the district attorney-elect who was to prosecute petitioner. The article described the new prosecutor as being "quietly confident" of getting a conviction.

In December 1960 one newspaper listed the Coors kidnaping and the capture of petitioner as the top two newspaper stories of the year. In January 1961 petitioner's counsel moved for a change of venue or continuance in light of the extensive publicity and the prominence of the victim in Jefferson County. Both motions were denied.

Most of the publicity during February and early March of 1961 was concerned with the procedural progress of the case, and very little prejudicial or spectacular material appeared. The trial commenced on March 13, 1960, with the voir dire of the jury panel which consisted of approximately 300 persons. On March 16, outside of the presence of the jury, the district attorney sought the endorsement of a new witness, who it was suggested might have been an eye-witness to the offense.

After an examination of the prospective witness in chambers, the trial judge allowed the late endorsement. The following day the Rocky Mountain News disclosed the identity of the new witness, as well as an account of her alleged witnessing of an attack upon the victim by one whom she believed to be the petitioner. This witness was never called by the State. It should be pointed out at this juncture that at the conclusion of each day's activity, during voir dire, the jurors who were tentatively selected were apparently sequestered and the rest of the panel was warned. After the jury was ultimately selected, they were sequestered for the balance of the trial.

The national publicity which has been emphasized by petitioner consists of two articles in the November 1960 and January 1961 issues of the Reader's Digest, and articles in the February issues of three national detective magazines. All of these articles were somwhat detailed and definitely implicated petitioner. The first Reader's Digest article, published before petitioner's arrest, was entitled "The FBI Wants This Man", and the sec-

ond article was entitled "How the Digest Helped Catch Killer Corbett."

Petitioner claims that all of this publicity created an envenomed atmosphere in Jefferson County and that in light of this fact, the trial court's denial of the motions for change of venue and continuance deprived him of due process of law.

■■■ In spite of the fact that virtually all of the jurors had to some extent been exposed to news publicity concerning petitioner's case, our examination of the very proper and thorough voir dire questioning discloses no actual prejudice to petitioner. All of the jurors expressed the view that they could and would try the matter fairly and solely on the evidence, and all of those who acknowledged having had an opinion concerning the case stated that they could set such beliefs aside. The following remarks by the United States Supreme Court are pertinent:

It is not required * * * that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961).

One of the jurors in the present case, Mr. Boyd, testified that he knew and sometimes did business with the brothers of the victim, however he did not know the victim himself. He stated that this relationship would not influence his verdict (Tr. 1274) and that he could be a fair and impartial juror (Tr. 1270 & 1276). He was passed for cause by petitioner's counsel.

Another juror, Mr. Reinke, admitted that he had read the two articles in the Reader's Digest. He stated that any opinions which he might have had concerning the case could be immediately set aside (Tr. 1297), and that he could decide the case solely on the basis of the evidence. He further stated that any information he had received of the case had come from "unreliable sources." (Tr. 1297) He was also passed for cause by petitioner's counsel.

■ It has been recognized by the United States Supreme Court that "[t]he fact that petitioner did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt." Beck v. Washington, 369 U.S. 541, 557–558, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962).

■ In short, petitioner has not demonstrated the existence of actual prejudice on the part of the jury, and our inquiry must now be directed to the *necessity* of such a showing. Traditionally the United States Supreme Court has required a criminal defendant to demonstrate that there was a nexus between the prejudicial publicity and his failure to receive a fair trial. See, e.g., Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955 (1962); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct 1639 (1961); Stroble v. State of California, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952). However, the Court has also determined that the conduct of the news media can in some instances be so inherently prejudicial and so pervasive in its effect that actual prejudice will be presumed. Such cases are Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), where defendant's act of confessing was repeatedly televised in the community where he was tried; Estes v. State of Texas, 381 U.S. 532,

**614**

85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), where the courtroom was invaded by teams of television cameramen and photographers; and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), which we shall now discuss.

Petitioner apparently reads *Sheppard* as holding that where a community has been exposed to considerable prejudicial pre-trial publicity, it must be presumed that his trial was not fair and impartial. We do not so read the case. The Supreme Court stated that:

> While we cannot say that Sheppard was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone, the court's later rulings must be considered against the setting in which the trial was held. 384 U.S. at 354, 86 S.Ct. at 1518.

The presumption of prejudice approach was justified in *Sheppard* not merely because of the inflammatory pre-trial publicity but because of the *"totality of circumstances"* attending his trial. 384 U.S. at 352, 86 S.Ct. 1507. We do not agree with petitioner's contention that in *Sheppard* the Supreme Court overruled Irvin v. Dowd, supra, *sub silentio.* As a matter of fact, *Irvin* is cited by the majority in *Sheppard,* apparently with approval. 384 U.S. at 351, 86 S.Ct. 1507.

Our task is one of analyzing all of the circumstances in petitioner's case to determine whether they were so egregious and inherently harmful as to obviate the necessity of showing actual prejudice. The *Sheppard* decision is perhaps our only yardstick. In *Sheppard* the significant circumstances included not only the pre-trial activity of the press but also their conduct and its effect *during* the trial. This phase of petitioner's case will also be examined.

We have already summarized the news coverage of petitioner's case from the time of the Coors disappearance to the time of petitioner's trial. During this period of approximately thirteen months several prejudicial and improper items of information were disseminated to the Colorado public. These included the past criminal record of petitioner, his refusal to make any comments on the Coors kidnaping, his refusal to submit to a lie detector test, and the identity and expected testimony of prospective witnesses for the State. All of these items have been termed improper for publication by the Reardon Committee. (This is the Advisory Committee on Fair Trial and Free Press of the American Bar Association Project of Minimum Standards for Criminal Justice, of which the Honorable Paul C. Reardon was chairman.) The press also published the nature of much of the State's evidence, as well as its relationship to petitioner's prosecution. Some of this evidence was never offered at trial.

It should be emphasized, however, that the publication of these items was for the most part spread over a considerable period of time, and much of it was found in the body rather than the headlines of the newspaper articles. There was no real saturation campaign of these prejudicial subjects.

The prejudicial sting of the pre-trial publicity was greatly softened by the passage of time. For example, the F. B.I. report, which provided a preview of much of the case against petitioner, was published in September 1960, while petitioner's trial was not held until March 1961, a full six months later. While the maxim "time heals all wounds" is certainly not a complete answer to the pretrial publicity problem, delay has been recognized as having a significant ameliorating effect. See, e. g., Beck v. Washington, 369 U.S. 541, 82 S.Ct. 955 (1962); United States v. Bowe, 360 F.2d 1 (2d Cir. 1966). Following the vast manhunt and arrest of petitioner in November of 1960, stories dealing with the Coors kidnaping and the prosecution of petitioner were generally relegated to the inside pages of the local newspapers and were apparently regarded as having a diminishing news appeal.

■ The articles which appeared in the national detective magazines shortly before the trial may be disregarded for all practical purposes, for apparently none

of the jury had read them or heard of their content.

Unlike the news coverage of the *Sheppard* case, the newspaper stories carried by the Denver Post and the Rocky Mountain News were in no sense accusatory or vindictive. They were generally objective and straightforward, although the amount of factual data they imparted was unusually great.

In *Sheppard* the news media frequently carried editorials in which the prosecuting authorities were urged to give Sheppard the "third degree" and assailed for their "fumbling" of the case. The editorials unquestionably bore the halmark of accusation.

The following are some of the headlines which appeared in the Cleveland newspapers prior to the Sheppard trial: "Quit Stalling and Bring Him In"; "Sam Declined July 4 Lie Test"; "Says Dr. Sam Talked Divorce"; "Testified Sam Changed Stories"; "Charges Sam Faked Injuries"; "Marilyn called Sam a Jekyll-Hyde"; "Kerr Called Dr. Sam a Bare Faced Liar"; "Doctor Re-enacts Story of Murder; Rejects Lie Test"; "But Every Moment of Fumbling is Helping a Murderer Escape"; "Sheppard Set For New Quiz"; "Getting Away with Murder; An Editorial"; "Why No Inquest? Do It Now, Dr. Gerber"; "Get That Killer"; "Why Don't Police Quiz Top Suspect; An Editorial"; "Why Isn't Sam Sheppard In Jail?"; "Who Will Speak for Marilyn"; "Dr. Sam Faces Quiz at Trial on Marilyn's 'Fear of Him'"; "Police Assert Couple Had Violent Rows".

The following is an excerpt from one of the editorials on the *Sheppard* case:

> Now proved to be a liar, still free to go about his business, shielded by his family, protected by a smart lawyer who has made monkeys of the police and authorities, carrying a gun part of the time, left free to do as he pleases, Sam Sheppard still hasn't been taken to headquarters.

See the various opinions on the Sheppard case in 384 U.S. 333, 86 S.Ct. 1507 (1966); 346 F.2d 707 (6th Cir. 1965);

231 F.Supp. 37 (S.D.Ohio 1964); State v. Sheppard, 165 Ohio St. 293, 135 N.E. 2d 340 (1956); and 100 Ohio App. 345, 128 N.E.2d 471 (1955).

The editorial campaign against Sheppard was even carried on by cartoons. See 231 F.Supp. at 52–53. The approach of one newspaper, the Cleveland Press, was described by the federal district court:

> For some reason that paper took upon itself the role of accuser, judge and jury. The journalistic value of its front page editorials, the screaming, slanted headlines and the nonobjective reporting was nil, but they were calculated to inflame the public. 231 F.Supp. at 63.

The press bombardment of Sheppard continued during the trial, and the jurors were not sequestered and received only a mild *suggestion* from the trial judge not to read or listen to the publicity. Several jurors admitted that during the trial they had heard a broadcast by Walter Winchell, reporting that a woman who had been arrested for robbery had stated that "she was the mistress of Sam Sheppard, and that he was responsible for the birth of a child." 231 F.Supp. at 62, f.n. 5.

In sharp contrast to the *Sheppard* case, petitioner's case was seldom editorialized in any manner. In one editorial, published in the Denver Post on November 13, 1960, the prosecution was criticized for keeping petitioner in jail for 12 days without having him arraigned or formally charged. The prosecution's attempt to get a confession during this extended detention was criticized, and the officials were said to be "running the risk of violating the rights of Joseph Corbett, Jr. * * *" This type of editorial treatment is a far cry from the finger-pointing editorial vendetta aimed at Dr. Sam Sheppard.

Not only was the pre-trial publicity in petitioner's case far less prejudicial and vindictive than that in the *Sheppard* case, but the atmosphere at trial was quite calm and serene in comparison with the virtual bedlam which reigned at the

Sheppard trial. As might well be expected, the courtroom was crowded during petitioner's trial and representatives of the various news media, including the international press services, were present during most of the proceedings. As in *Sheppard,* the press were assigned tables within the bar of the court, a practice which Justice Clark termed "unprecedented". It is at this point, however, that the similarities between petitioner's and Sheppard's cases end and the patent contrasts begin.

Witnesses testifying at the evidentiary hearing which was held in the present matter stated that the number of reporters at petitioner's trial probably never exceed ten at any one time; the average number present would have been between five and eight.

While petitioner's trial was attended by no more than ten reporters at a time, the trial judge in the *Sheppard* case "assigned almost all of the available seats in the courtroom to the news media." 384 U.S. at 355, 86 S.Ct. at 1518. The Supreme Court in *Sheppard* pointed out that:

> The movement of the reporters in and out of the courtroom caused frequent confusion and disruption of the trial. And the record reveals constant commotion within the bar. 384 U.S. at 355, 86 S.Ct. at 1518.

The record in petitioner's case is virtually bare of any semblance of confusion or disturbance caused by the news media. The only instance in the record where the proceedings were interfered with was when the many members of the jury panel in the courtroom overreacted to a remark of another prospective juror during voir dire examination. (Tr. 831).

There is no indication that petitioner was ever hounded or harassed by the news media, and he was never made the center ring attraction at a sort of a three-ring circus, as were Sam Sheppard and Billy Sol Estes. For all intents and purposes petitioner's trial was an orderly one, considering the fact that it was a murder trial stemming from the kidnaping of a very prominent Colorado citizen.

██ Our reading of the record and the testimony we have heard from two newspaper reporters who covered the trial disclose no significant concessions made to the press by the trial judge. He outlawed cameras of any kind in the courtroom and also prohibited direct radio and television broadcasting from within the courtroom. His decision to allow the press to sit at special tables within the bar of the court may have been ill-advised under the circumstances, but the mere *presence* of ten reporters, who did not interfere with the proceedings, cannot be said to have deprived petitioner of that "judicial serenity and calm to which [he] was entitled." Estes v. State of Texas, supra, 381 U.S. at 536, 85 S.Ct. at 1629, 14 L.Ed.2d 543. Dr. Sheppard's trial was a "Roman Holiday" for all of the news media, but petitioner's trial was simply newsworthy material for fewer than a dozen members of the press, whose conduct during trial was, for aught we can tell, perfectly decorous.

A crucial distinction between petitioner's case and that of Sheppard with respect to publicity vented *during* the trial was that the trial judge had the jury sequestered during petitioner's trial. The jury was simply not exposed to any trial coverage of any kind.

We conclude that the circumstances attending the investigation, arrest, detention and trial of petitioner, although disturbing, fall far short of the totality of aggravating circumstances present in *Sheppard.* The distinctions in petitioner's case which we regard as salient include the delay between most of the pretrial publicity and the trial, the lack of vindictiveness of the publicity, the sequestration of the jury and the relative orderliness of the trial proceedings.

██ We thus hold that the "totality of circumstances" in petitioner's case has not been shown to have been so inherently harmful that we must presume that he was prejudiced and unable to receive a fair trial by an impartial jury. The trial judge's denial of a venue change or continuance cannot be viewed as con-

stitutional deprivations, and this ground is also insufficient.

Although we have concluded that the news media did not vitiate petitioner's right to a fair trial, we do not mean to indicate thereby that we sanction the improper publicity, nor the activities of those who caused it in the present case.

■ We subscribe to the cherished principle of freedom of the press, and we recognize the important duty of the press to keep the public informed, particularly when the safety and welfare of the community are involved. Nevertheless, we feel that these exalted principles cannot properly be invoked as justification for the dissemination of such prejudicial information as the criminal record of an accused and his failure to comment or take veracity tests. We do not perceive any genuine necessity for the public's receiving such information, and its potential prejudicial effect upon the prosecution of a criminal case is now quite apparent. The news media should exercise discretion and care in this regard, and indeed we are convinced that they are becoming increasingly aware of this responsibility.

Certainly not all of the blame for the harmful publicity can be laid at the feet of the press. Most of the information which they published would never have been available had it not been for the overzealous release of material by the law enforcement and prosecution officials. These officials also have the very important responsibility of protecting the rights of the accused, and they should now pay close heed to the recommendations of the *Reardon Committee* and other agencies, with regard to what information can properly be released to the news media.

■ Finally, we note some procedural safeguards which a trial judge can and should follow to assure the fair trial of an accused. Certainly the sequestration of the jury is a significant prophylactic, but a judge should also be rather receptive to motions for venue change or trial continuance in order to minimize the effect of pre-trial publicity. It is difficult to imagine an *over-abundance* of caution in this respect.

■ When the bounds of proper publicity are being exceeded by the press, by law enforcement and prosecution officers, or by defense counsel, a trial judge should draw clear guidelines and, if need be in extreme instances, even consider resorting to his inherent powers to impose sanctions.

-IV-

Petitioner's final ground is that he was denied due process of law by the trial court's failure to declare a mistrial on three separate occasions. The following are the incidents which petitioner argues were so prejudicial as to compel the declaring of a mistrial:

1) At one point during the voir dire examination a prospective juror made a flippant remark at which the panel laughed. The trial court admonished the panel and pointed out the seriousness of the matter. The district attorney then made the following statement prompting the mistrial motion: "You can appreciate this is most serious to this defendant, it is most serious to the Coors family." (Tr. 831).

2) During a recess the bailiffs brought coffee and rolls to the jury in a box upon which the name "Coors" was printed.

3) The district attorney asked members of the jury if they knew members of the sheriff's office, who were seated at the door of the courtroom and who were guarding petitioner. These officers were asked to stand and identify themselves.

■ As a general principle, the necessity of granting a mistrial because of the potential prejudice of occurrences during trial is addressed to the sound discretion of the trial judge. Bacino v. United States, 316 F.2d 11 (10th Cir. 1963); Webb v. United States, 191 F.2d 512 (10th Cir. 1951); cf., Gori v. United States, 367 U.S. 364, 81 S.Ct. 1523, 6 L. Ed.2d 901 (1961); Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

The question is whether "taking all the circumstances into consideration, there is a manifest necessity for the act, [declaring a mistrial] or the ends of public justice would otherwise be defeated." Wade v. Hunter, supra, 336 U.S. at 689–690, 69 S.Ct. at 837, quoting from United States v. Perez, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165 (1824).

Reviewing the incidents enumerated by petitioner, we cannot conclude that the trial judge's failure to declare a mistrial constituted such an abuse of discretion that the ends of justice were defeated and the petitioner robbed of due process of law.

The district attorney's allusion to the Coors family during voir dire examination was purely accidental and was not calculated to inflame the jury. It was simply a careless remark which we do not believe had a harmful effect upon the trial. The trial judge ordered that the comment be striken and disregarded by the jury, and he pointed out that the Coors family was not involved. Of course the name Coors was repeatedly brought up during the trial and was an inextricable part of the entire proceeding.

The bailiff's service of coffee to the jury in a "Coors" beer carton was an unfortunate occurrence, but we do not believe that this incident was inherently prejudicial. The printed name "Coors" on the carton, even if noticed by the jury, would not in our opinion have had even the slightest effect on the state of mind of the individual jurors, who were exposed to the name throughout the trial. We have no reason to believe that the jurors would have deviated from their oath that they would decide the case solely on the basis of the evidence admitted in the courtroom.

Finally, we do not feel that the identification of the sheriff's officers who were stationed at the door to guard petitioner could have so prejudiced petitioner as to deprive him of a fair trial. As we have already noted, petitioner was properly in custody during the trial, so the presence of the guards in the courtroom was justified. It should also be noted that the trial judge ordered the district attorney to refrain from the identification of the guards. The trial judge's failure to declare a mistrial was within his discretion and did not effect a deprivation of petitioner's constitutional rights.

We conclude that petitioner received a fair trial consistent with the constitutional guarantee of due process of law, and it is therefore

Ordered that the petition for a writ of habeas corpus be and hereby is denied.