Joseph F. Hawkins, J.
The Court of Appeals in People ex rel. Rohrlich v. Follette (20 N Y 2d 297, 302), with three Judges dissenting, remanded relator’s writ of habeas corpus for a hearing ‘ ‘ to establish, if he can, his allegation that he could not and did not receive a fair trial because of the pretrial publicity.”
The petitioner is presently in the custody of the Warden of Green Haven Prison having been convicted, after a trial by jury, of the crime of robbery in the first degree and for which he was sentenced to a term of 15 to 35 years imprisonment. The judgment of conviction was affirmed by the Appellate Division (7 A D 2d 733) and, after leave to appeal was granted, the Court of Appeals in People v. Rohrlich (6 N Y 2d 785) affirmed the conviction. The United States Supreme Court denied an application for a writ of certiorari on June 10, 1963 (Rohrlich v. New York, 374 U. S. 813).
The quintessence of relator’s argument is that, as obtained in Sheppard v. Maxwell (384 U. S. 333) the grievously biased, prejudicial and inflammatory news coverage of the pretrial events deprived him of his constitutional right to a fair and impartial trial.
Although twice so offered, the relator declined the court’s offer to appoint counsel, insisting that he deemed it11 in my best interest to proceed in my own behalf in this matter ” and, “No. I prefer to represent myself, with your Honor’s permission.” Further, the relator was rather adamant that the hearing proceed on the basis of the exhibits he presented despite suggestions and the offer by the court that the relator might be well-advised *202 to agree to the matter being adjourned to the following month at which time the same Judge was to preside at Special Term at Green Haven Prison, thereby according the relator an opportunity at ‘ ‘ the next hearing to add anything further you might wish. It will be September 22nd. I will be here again. ”
The petitioner relies upon some 24 news items which were published during the period from August 12, 1957, to October 10, 1957. All told, some 15 separate articles are presented. In some of the news articles, photographs of the petitioner are featured. In one (Aug. 18, 1957), he is portrayed with his hands covering his face and on September 12, 1957, he is shown concealing his face with his coat. After his arrest for robbery, the New York Sunday Mirror published Rohrlich’s photograph with the caption “ End of Drive ”. On the same day, the New York Sunday News had a news item entitled “ Thugs Finger a Fingerman ’ ’, with a similar story line. On September 6, 1957, petitioner was discharged from custody for lack of evidence.
Thereafter, on September 11, 1957, Rohrlich was again arrested — this time in connection with an alleged homicide. The homicide was attributed by the press to Rohrlich and others having rather extraordinary standards of chivalry. It was characterized as a “gallantry slaying” in which two ‘ ‘ knights errant ’ ’ irrevocably eliminated a swain to accommodate a 22-year-old barmaid. Her ardor having cooled, to employ her purported terse and colloquial language, she wished “to dump the old man ’ ’.
A similar vein runs through other news items recounting this homicide. Subsequent articles stated that the barmaid was being held as a material witness and that it was anticipated she would provide evidence against Rohrlich and others who were implicated.
On October 4, the homicide charges against the petitioner “were dropped ”. The news reports explain that the “ femme fatale ” had refused to testify. Rohrlich, however, was rearrested on October 20, and charged with the robbery which had occurred on August 17, 1957; and it was for this latter charge that he was tried and convicted.
Petitioner further asserts that the exhibits he submitted do not constitute the entire aura of prejudicial and adverse publicity to which he was subjected for there were also television and radio news broadcasts in a similar vein; also magazine articles.
An examination of the exhibits reveals that rather minor emphasis was placed upon petitioner; the thrust of the several news stories rather was directed to the bizarre and quixotic circumstances leading to the slaying, although, concededly, the *203 relator’s photograph appeared in connection with several of the news accounts. The news accounts were written in rather heavy-handed and purportedly humorous style. If we were to classify the genre, we should denominate it “ black ” or “ sick ” humor.
The Daily News of September 12 printed petitioner’s photograph on page 1, in juxtaposition with that of the young and comely barmaid with the caption: “ Her Wish Becomes a Killing ”. On page 2 of that periodical’s account, under the heading “ Murder for Gallantry Jails Two in Brooklyn ”, Miss Camberdella’s photograph appears together with that of the victim of the murder with the petitioner’s photograph appearing in the continuation of the story on page 6. Again, there is a heavy-handed and maladroit treatment of the murder in which the alleged participants are referred to as “ the Brooklyn knights of King Arthur’s Court ”.
On that same day (Sept. 12, 1957) the New York Mirror featured photographs of petitioner and the young woman; but the news story was confined to her role in the alleged solution of the case. The New York Mirror used the inevitable precept alliteratively as ‘1 classic counsel of crime detectives — ‘ cherchez la femme ’ ”. It referred to Bohrlich and others as having been “rounded up for a series of holdups ”.
The New York World-Telegram was far less sensational in its treatment. Although featuring photographs of Bohrlich under the caption “ Back in the Toils ”, the article’s lead refers to “ Girl Witness Identifies Two In Killing of Photographer The New York Journal-American had no photographs and was content to limit its account under the caption ‘ ‘ Probe Pledged of Immunity to Girl in Slaying ”. The New York Post stressed the impact on the victim’s family, heading its article “ Slain Man’s Family Shaken by Story He Was Killed Over an Illicit Bomance ”. The photograph is that of Miss Camberdella.
The petitioner’s journalistic importance thereafter seems to have diminished appreciably for the subsequent articles are centered upon Miss Camberdella, and one article is captioned “ Gang Girl Tries Suicide in Cell The Daily News of October 3, confined its story under the terse but vivid headline “ Bail Switch Keeps Bedhead Moll Out of Mob’s Clutches ”, and the Daily Mirror of same date, reverts to the femme fatale motif, again featuring her photograph under the caption ‘ ‘ Girl Clams in Killing ”.
The last of the articles was published on October 5. The trial, however, was not held until February of 1958, some four months thereafter.
*204 There is nothing presented to the court from which it can determine whether there was a motion for a change of venue and if so, the disposition; nor how many, if any, jurors were challenged for cause because of the newspapers’ stories of petitioner’s alleged involvement with the crime with which he was charged and of the crime for which, presumably, there was never any indictment.
The relator, to prevail, must establish that the facts and circumstances attendant upon the pretrial publicity come within the criteria promulgated by the United States Supreme Court in Sheppard v. Maxwell (384 U. S. 333) i.e., that the attendant publicity was so inescapably and inexorably prejudicial as to militate against his being accorded a fair trial.
Upon the presentation made, petitioner fails to demonstrate actual prejudice; nor can prejudice be presumed from these articles. Substantially antedating the trial, they do not vary appreciably in scope, intensity or conceit from too many journalistic reports of bizarre or sordid incidents.
We do not deem Sheppard v. Maxwell (supra) applicable to. the writ at bar. Petitioner places his prosecution in the same category as that of Dr. Sheppard. The opinion in Sheppard, however, reveals the unprecedented, overwhelming and all-pervading pretrial and pendente Ute publicity which engulfed that prosecution. Further, there the Trial Judge failed, as found by the United States Supreme Court, to have limited the scope of the press’ participation and controlled its demeanor during the trial, which error was so egregious as to have merited that court’s criticism (p. 361): “More specifically, the trial court might well have proscribed extrajudicial statements by any lawyer, party, witness, or court official which divulged prejudicial matters, such as the refusal of Sheppard to submit to interrogation or take any lie detector tests; any statement made by Sheppard to officials; the identity of prospective witnesses or their probable testimony; any belief in guilt or innocence; or like statements concerning the merits of the case.
The court in Sheppard, further noted (p. 362): “Had the judge, the other officers of the court, and the police placed the interest of justice first, the news media would have soon learned to be content with the task of reporting the case as it unfolded in the courtroom — not pieced together from extrajudicial statements.”
It is obvious that in Sheppard, the United States Supreme Court’s holding was based not only upon the pretrial publicity but also upon the conduct of the trial itself and the consequent presumed prejudicial and adverse influence upon the jury.
*205 In the course of the court’s research as to any post-Sheppard developments, Ave find the most erudite and apposite opinion of Chief Judge Alfred A. Arraj of the United States District Court for the District of Colorado Avhich he rendered in Corbett v. Patterson (272 F. Supp. 602 [July 3, 1967]). Judge Arraj, aptly and tersely categorized the issue as “fair trial — free press ” and stated the essence of the problem to be resolved, succinctly and accurately, as (p. 611): “ one of determining Avhether the activities of the press media prevented petitioner from receiving a fair hearing by an impartial jury in a judicially calm atmosphere. ’ ’
He further epitomized Sheppard as follows, and we concur (p. 614): “ The presumption of prejudice approach was justified in Sheppard not merely because of the inflammatory pre-trial publicity but because of the ‘ totality of circumstances ’ attending his trial.”
As noted in Corbett v. Patterson (supra) the attendant circumstances must be “ so grievous and inherently harmful ” as to make the conclusion inevitable and inescapable that there was so substantial, significant and meaningful prejudice as to make it incumbent upon the court to grant the writ. We find that the contrary obtains at bar. The writ is dismissed.